**Betty Thornton LAWRENCE. Appellant,**

v.

**The STATE OF Texas, Appellee.**

**No. 603–83.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 6, 1985.

Frank W. Sullivan, III, Fort Worth, for appellant.

Arthur C. Eads, Dist. Atty., and James T. Russell, Asst. Dist. Atty., Belton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

CAMPBELL, Judge.

Appellant was convicted by a jury for the offense of murder. V.T.C.A., Penal Code § 19.02. The jury assessed a term of 25 years in the Texas Department of Corrections. The Austin Court of Appeals reversed appellant's conviction, finding the evidence insufficient to sustain a murder conviction. The court of appeals also found that the jury charge was "fundamentally defective," see *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr.App.1984), and ordered "the judgment of conviction for murder reversed and the indictment for murder dismissed." However, since the court of appeals further found the evidence sufficient to show voluntary manslaughter or any other lesser included offense, that court held that the dismissal of the murder indictment was "without prejudice" to further prosecution for a lesser included offense." *Lawrence v. State*, 699 S.W.2d 229 (Tex.App.—Austin, 1983).

We granted the State's petition for discretionary review to determine the correctness of the court of appeals holding that the evidence was insufficient to prove appellant guilty of murder. We will also review the court of appeals holding that the charge to the jury on the law of murder is "fundamentally defective." We conduct this latter review because of this Court's recent decision in *Almanza v. State*[1], 686 S.W.2d 157 (Tex.Cr.App.1985). After reviewing the entire record and the law applicable to the case, we will reverse the court of appeals and affirm appellant's conviction.

### I. FACTS[2]

A detailed recitation of the facts is necessary to the disposition of the case. Appellant and the deceased were live-in lovers. On August 1, 1979, at approximately 2:30 p.m. they met at the Hitching Post Bar in Killeen. They drank together until approximately 4:30 p.m., at which time they returned to their apartment and appellant fixed dinner for the two of them. They then returned to the Hitching Post. Sometime between 7:30 and 8:00 p.m., the couple went to the Waterhole No. 3, another drinking establishment.

At approximately 9:30 p.m. the appellant left the bar to pick up her son from a baby-sitter. After taking care of her son, she returned to the Waterhole. When she walked into the bar, she observed the deceased dancing with another woman. According to an employee of the bar, appellant knocked the woman to the floor. Appellant claimed she merely pushed the woman and the woman stumbled and fell. A bartender testified that appellant, shortly after the altercation with the deceased's dancing partner, was very angry and upset and repeatedly threatened to "shoot his peter off." Appellant specifically denied being very angry or upset and also denied making any threats to harm the deceased.

Appellant pleaded with the deceased to leave the bar. Both deceased and the appellant then left the Waterhole and drove to their apartment. The deceased refused to go into the apartment; appellant replied that she was going to go with deceased if he was going out. Both parties then returned in separate vehicles to the Hitching Post. It being near closing time, the bar owner refused to serve the deceased and asked appellant to drive deceased home. In the owner's words, deceased was stumbling, falling-down drunk.

Appellant drove deceased home. She testified that the deceased was hostile and angry because appellant refused to apologize to "the woman." Appellant enlisted the assistance of Paul Miller, a next door neighbor, in getting the deceased out of the car and into the house.

According to appellant's testimony, she was cleaning up when the deceased grabbed her and threw her on the couch

---

1. Hereinafter referred to simply as *Almanza*.

2. We borrow liberally from the appellant's brief.

and started beating her with his fist. She screamed and Paul Miller and Martha Graves, Paul Miller's roommate, came running over. Appellant claimed to have no recollection of the events following Paul Miller's entrance to the apartment. All appellant could recall was that when the deceased was beating her she was scared.

Miller and Graves both testified that when they entered the apartment appellant was on the couch and the deceased was standing five to seven feet away from appellant. Appellant yelled "Paul, keep him away from me" and Paul Miller grabbed the deceased. Martha Graves heard the deceased say "shut up, or I'm going to knock your damn head off." [3] At this point appellant walked over the couch and into a bathroom where she retrieved her revolver. She entered the room and fired 2 shots, one of which fatally struck the deceased in the stomach. Paul Miller further testified that when appellant fired the first shot he shoved the deceased behind him and out of the way. Appellant in turn took a step around Paul Miller and shot a second time, this time hitting the deceased. Miller and Graves left immediately. Appellant assisted the deceased outside the apartment. Police were called immediately, and upon their arrival found the appellant sitting on the ground holding deceased's head in her lap. An emergency room doctor testified that the deceased died of massive bleeding due to the gunshot wound, and furthermore that deceased's blood-alcohol content measured .221 milligrams per cent by weight and that .500 milligrams per cent would be lethal to most people.

Neither the eyewitnesses nor the investigating officers noticed any bruising on appellant the night of the offense. A police officer, who was a personal friend of appellant and the deceased, noticed a large bruise on appellant at around 10 p.m., some twenty hours after the shooting and alleged beating. A doctor who examined appellant *5 days* after the shooting found bruising that was consistent with the appel-

lant having been injured 3–7 days *before* the examination.

Appellant attempted to paint a picture of the deceased as a violent man; however, no other testimony supports this view. The neighbors both testified that the evening of the homicide was the first time they had heard any fighting between appellant and the deceased. Other witnesses who frequented the same bars as deceased described the deceased as easy-going and non-violent, although sometimes boisterous. Appellant's ex-husband testified he saw the appellant with scratches on her neck 2 days before the homicide. There was no evidence indicating that the apartment was in disarray as one would expect if there had been an altercation, and no one ever saw the deceased strike the appellant, either on the night in question or anytime before that night.

## II. SUFFICIENCY OF THE EVIDENCE TO RAISE THE ISSUE OF VOLUNTARY MANSLAUGHTER AND NEGATION OF THE SAME BY THE STATE

Appellant was charged with murder in a two paragraph indictment, each paragraph alleging a different manner of committing murder. See V.T.C.A., Penal Code § 19.-02(a)(1) and (a)(2). This Court has held that if the issue of sudden passion is raised, then the State must disprove beyond a reasonable doubt the existence of sudden passion. *Bradley v. State*, 688 S.W.2d 847 (Tex.Cr.App.1985). Additionally, this Court has repeatedly held that evidence from any source may raise the issue of sudden passion. *Gonzales v. State*, 546 S.W.2d 617 (Tex.Cr.App.1977). Testimony that the defendant was extremely mad or upset can raise the issue. *Schoelman v. State*, 644 S.W.2d 727 (Tex.Cr.App.1983). Moreover, in some instances, the evidence can raise both self-defense *and* voluntary manslaughter. *Medlock v. State*, 591 S.W.2d 485 (Tex.Cr.App.1980). While former provocation, standing alone, will not suffice, see V.T.C.A., Penal Code § 19.04(b) supra, for-

---

**3.** Paul Miller did not recall hearing this threat.

mer provocation along with a showing of a defendant's agitated state of mind will raise the issue. Testimony that the defendant was in fear, standing alone, does not raise sudden passion. *Daniels v. State,* 645 S.W.2d 459 (Tex.Cr.App.1983). Thus before we can determine if the evidence is sufficient to sustain appellant's conviction for murder, we must determine if sudden passion is raised by the evidence.

█ If we were to look at only the appellant's testimony, we would find no issue of sudden passion. Appellant denied being angry or upset at the deceased. She claimed simple fear, and in fact, denied having any recollection of the shooting. This testimony does not raise sudden passion. However, other witnesses testified that the appellant was in fact very angry and upset at the deceased's behavior earlier in the evening. This shows former provocation and, when coupled with the decedent's alleged beating of appellant immediately preceding the shooting, is sufficient to raise the issue of sudden passion. Thus, the State was required to prove beyond a reasonable doubt that appellant was not acting under the immediate influence of sudden passion. *Bradley,* supra.

█ Although we find there was sufficient evidence to raise the issue of voluntary manslaughter, there was more than sufficient evidence to convict appellant of murder. Appellant herself refuted any claim of voluntary manslaughter. Indeed, during closing argument, appellant's attorney argued that the facts presented a classic case of self-defense.[4] Voluntary manslaughter, as a defense to murder, seems to have appeared in the case as an afterthought. As the trier of fact, the jury determined the credibility of the witnesses and the weight to be given their testimony,

and it was free to reject any or all of the testimony of any of the witnesses. *Thomas v. State,* 605 S.W.2d 290 (Tex.Cr.App. 1980).

When reviewing sufficiency of the evidence questions, this Court will not substitute its judgment for that of the jury. This Court has previously found that:

"It is irrelevant whether we as a Court believe the evidence, or believe that defense evidence 'outweighs' the State's evidence. If there is any evidence that establishes guilt beyond a reasonable doubt, and if the trier of facts believes that evidence, we are not in a position to reverse the judgment on sufficiency grounds." *Combs v. State,* 643 S.W.2d 709, at p. 716 (Tex.Cr.App.1982).

We find the evidence more than sufficient to support the jury's verdict.

Although the State does not challenge the court of appeals' finding that the jury charge is fundamentally defective, we find we must review this holding in view of this Court's recent decision in *Almanza,* cognizant of the fact that neither the State nor the court of appeals had the benefit of our holding in *Almanza* in the case sub judice.

## III. THE JURY CHARGE—"COBARRUBIO ERROR" IN LIGHT OF ALMANZA

The court of appeals found that the trial court fundamentally erred when it failed to require the jury to find, beyond a reasonable doubt, the absence of sudden passion before it could convict appellant of murder. That court relied on this Court's holding in *Cobarrubio,* supra.

█ Prior to our holding in *Almanza,* this Court had not had the opportunity to determine if "Cobarrubio error" was fundamental under our State law.[5] See *Cumbie*

---

4. The appellant's attorney in closing argument made the following statements:

"How much provocation do you need before you defend yourself. The defensive [sic] firmly believes that this is a classic case of self-defense. . . .

Later on the appellant's counsel continued:

"Paragraph 5 addresses the voluntary manslaughter issue. It is the defenses' firm position that this is a self-defense case."

5. Note 3 of the Clinton dissent suggests this Court should continue to remand cases to the courts of appeals for consideration of jury charge error in light of *Almanza.* Because of what we perceive to be an obvious conflict be-

*v. State*, 578 S.W.2d 732 (Tex.Cr.App.1979). In *Cumbie*, supra, this Court found four basic categories of fundamental error. The first category noted was "an omission from the court's charge of an allegation in the indictment which is required to be proved", *Cumbie* at 733. The evil addressed was that a jury was permitted to convict a defendant without finding all the essential elements of the crime charged. This constituted a diminution of the State's burden of proof. While we recognize that "Cobarrubio error" is distinguishable from "Cumbie error" in that the "element" omitted from the jury charge need not be pled in the indictment, nonetheless the evil perceived in the omission is arguably the same. In "Cobarrubio error" the jury is permitted to convict a defendant of murder without finding that the State disproved the existence of sudden passion, thus diminishing the State's burden of proof. We therefore find that "Cobarrubio error" is error, that, under our now abandoned holding in *Cumbie*, supra, would have necessitated automatic reversal.

Today we repeat what Judge Clinton opined in *Almanza:*

"We hold that finding error in the court's charge to the jury begins—*not ends*—the inquiry; the next step is to make an evidentiary review along the lines of that described in *Davis*, supra, as well as a review of any other part of the record as a whole which may illuminate *the actual, not just theoretical*, harm to the accused." [citations omitted] *Almanza*, at 174.

Under this Court's holding in *Almanza*, a determination of whether "fundamental error" exists in a jury charge requires a case-by-case analysis. This Court no longer recognizes per se reversible jury charge error, having overruled *Cumbie*, supra. By failing to object in the instant case, the appellant is charged with showing *actual egregious harm*. We quote from *Almanza:*

"... if no proper objection was made at trial and the accused must claim that the error was 'fundamental' he will obtain reversal only if the error was not egregious and created such harm that he 'has not had a fair and impartial trial'— in short 'egregious harm.'

"In both situations the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.

.    .    .    .    .

"This conclusion is not undermined by the fact that some of the cases couple the phrases 'error of a fundamental nature' or 'material error' with 'calculated to injure.'

.    .    .    .    .

"Should it be, for instance, 'a *material* misdirection of the law applicable to the case,' then the next determination was whether under the circumstances of the case the error was 'calculated to injure the rights of the defendant,' ..." *Almanza* at 171–172.

In *Almanza*, we made it quite clear that in each case of unobjected-to jury charge error, this Court must weigh the evidence:

"... But in determining whether the error is material ... we are to look to the whole record bearing upon the subject. *What was the nature of the testimony supporting the verdict?* Was it cogent and overwhelming? What was *the character of the* testimony presenting the phase or theory of the case omitted to be noticed in the charge, and upon which omission error is assigned? Was it at all reasonable? Did it present a theory which a reasonable mind could entertain, *or was it supported by such testimony as was remotely calculated to destroy*

tween *Cobarrubio* and *Almanza,* we believe that this Court should accept the responsibility of ultimate resolution. Additionally, in some of the cases that have been remanded to the courts

of appeals because of "Cobarrubio error", the issue of sudden passion was not even raised in the trial of the case.

*the State's case when considered in connection with the other testimony in the case, as well as the charge as a whole? Was the phase of the case simply an addition to the case as made by the State and consistent therewith, or was it in direct conflict with the State's theory? These are all important matters to be considered in passing upon the [degree of harm] in the omission or error....*" (citations omitted)

*Almanza* at 173–174, citing *Davis v. State,* 28 Tex.Ct.App. 542, 13 S.W. 994, 995 (1890), writ of error dism'd, 139 U.S. 651, 11 S.Ct. 675, 35 L.Ed. 300 (1891).

Judge Clinton opined in *Cobarrubio,* supra, that the failure of a trial court to charge in accordance with *Cobarrubio* "precipitated a denial of due process of law in the most fundamental sense," 675 S.W.2d at 752, and perforce constituted fundamental error. We cannot accept this position as being consistent with this Court's holding in *Almanza.* Such an application of the doctrine of fundamental error ignores the necessity of a finding of *actual egregious harm* as *Almanza* requires. To the extent that *Cobarrubio* held that jury charge "error precipitated a denial of due process of law in the most fundamental sense," *Cobarrubio* at 752, it is overruled. "Cobarrubio error" will be assayed in light of our holding in *Almanza.*

Judge Teague, along with the court of appeals, posits his argument that, *Cobarrubio* error is fundamental error of *federal constitutional dimension,* [emphasis added] primarily on *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Cf. *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). In *Mullaney,* the Maine statute prescribed that a *defendant prove* by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. The Supreme Court held that "the due process clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sud-

den provocation when the issue is properly raised in a homicide case." *Mullaney,* supra at 704, 95 S.Ct. at 1892. The Maine *statute* was thus found to be infirm, the burden not being placed on the State to prove every element of its case beyond a reasonable doubt. See *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)

In this state, the burden is on the prosecution in Sec. 19.02, supra, a fact that we confirmed only recently in *Bradley,* supra. See ante, p. 215. Thus, we find that the Texas murder statute and the holding in *Bradley,* supra, are harmonious with the holding in *Mullaney,* supra.

Even if we concede, as does our brother Teague, that the error in the instant case was of federal constitutional dimension, we know of nothing in the law that saves appellant from her failure to object to the charge. Our state law provides that any such objection or refusal of any specially requested charge "shall be made at the time of the trial." Art. 36.19, V.A.C.C.P. It is this failure by the appellant that is the backbone of the holding in *Almanza,* supra.

■ We conclude that when a review of the entire record shows, as here, that voluntary manslaughter is an incidental theory of the defense, the subtle deletion of the State's burden of proof on the absence of sudden passion in the murder application paragraph cannot realistically be construed to inure to the defendant's egregious harm. Under these circumstances, we cannot say that the unobjected-to jury charge error was "so egregious and created such harm that [appellant] has not had a fair and impartial trial."

The judgment of the court of appeals is reversed and the judgment of the trial court is affirmed.

TEAGUE, Judge, concurring and dissenting.

The majority correctly reverses the holding that the Austin Court of Appeals made in its unpublished decision of *Lawrence v.*

*State*, No. 3–82–296, May 11, 1983, that the evidence is insufficient to sustain appellant's conviction for murder. In this, I concur. However, but because the majority errs in holding that the court of appeals incorrectly held that the jury charge was not *Federally* constitutionally defective, I must dissent, because the court of appeals did not err.

The court of appeals, in holding that the evidence was insufficient, found that because the issue of sudden passion was raised by the evidence, and because the State failed to disprove sudden passion beyond a reasonable doubt, that this necessitated its holding that the evidence was insufficient. I agree with the majority opinion that "If there is any evidence that establishes guilt beyond a reasonable doubt, and if the trier of fact believes that evidence, [this Court is] not in a position to reverse the judgment on sufficiency grounds." The facts that are set out in the majority opinion are clearly sufficient to support the verdict of the jury, i.e., that the evidence is sufficient to establish beyond a reasonable doubt that appellant intentionally or knowingly caused the death of the deceased, as alleged in the indictment. The court of appeals erred in holding that the evidence was insufficient to support the verdict of the jury finding appellant guilty of the offense of murder, as alleged in the indictment.

In the trial court, the question of what constitutes an adequate cause to kill by the accused, when he is then acting under the immediate influence of sudden passion, is an issue of fact for the trier of fact. *Roberts v. State*, 590 S.W.2d 498 (Tex.Cr.App. 1979). However, on appeal, where the defendant has been convicted of the offense of murder, and the evidence at trial raised the issue of adequate cause or sudden passion, an attack on the sufficiency of the evidence falls under the following rule: "[I]f the issue of sufficiency is raised on appeal and a jury has found a defendant guilty of the offense of murder, as alleged in the charging instrument, and the issue of adequate cause was raised and rejected by the jury, this Court will make two deter-

minations: (1) whether the evidence was sufficient to establish the offense of murder and (2) whether the evidence was sufficient to disprove the issue of adequate cause." *Jefcoat v. State*, 644 S.W.2d 719, 725 (Tex.Cr.App.1983).

In this instance, the evidence that was presented to the jury, or that might have been presented to any rational trier of fact, was clearly sufficient to establish beyond a reasonable doubt that appellant committed the offense of murder as stated in V.T. C.A., Section 19.02(a)(1), and as alleged in the indictment in this cause. The evidence is also sufficient to establish beyond a reasonable doubt that the State disproved the issue of adequate cause or sudden passion.

Thus, the majority opinion correctly holds that the evidence is sufficient to support the jury's verdict. I concur.

However, the majority errs in holding that the trial court did not commit *Federal* constitutional error in its instructions to the jury in this cause.

Because the majority errs, I must respectfully dissent, and must once again fulminate over this Court's invocation and application of *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985), which I have dubbed "Almanza the Terrible," to the issue that is before us, namely, whether the failure of the trial court to properly place in its instructions to the jury on the offense of murder the fact that the State had the burden of proof to disprove the lack of sudden passion constitutes such a deprivation of appellant's rights under Federal Constitutional law causes this conviction to be reversed. It should be obvious to any intelligent person that *Almanza v. State*, supra, is so full of evil that it should be expressly overruled before it gives birth to too many more illegitimate children

Perhaps, however, we can hope that the present majority of this Court is only going through an era of aggressive majoritarianism, and perhaps also we can hope that it is only imitating what the present majority of the Supreme Court of the United States has been doing in recent times, i.e., that

Court is going through a transitional period, trying its dead level best to betray its responsibility to serve as the impenetrable bulwark of the Federal Constitution, and as the guardian of Federal Constitutional rights. See "Individual Rights and Majoritarianism: The Supreme Court in Transition," a study recently released by the Cato Institution, a Washington, D.C. based public policy research institute.

I find that the court of appeals correctly held that the failure of the trial court in its instructions to the jury to place the burden of proof on the State to prove the lack of sudden passion, in the paragraph of the charge applying the law of murder to the facts of the case, was error of *Federal* Constitutional dimension.

The majority errs in invoking and applying to this cause what it stated and held in *Almanza v. State,* supra, concerning deprivation of an accused's rights under *State* law because of instructions to the jury by the trial judge.

In all due respect to the author of the majority opinion, and contrary to his statement that "Prior to our holding in Almanza, this Court has not had the opportunity to determine if 'Cobarrubio error' was fundamental under our State law," I must point out that in *Jenkins v. State* (Tex. Cr.App. No. 64,000–64,004, February 16, 1983) (Now Pending on State's Motion for Rehearing for almost three years), not only did this Court have the opportunity "to determine if 'Cobarrubio error' was fundamental error," but it made that determination without a single dissenting opinion, and held that such error was fundamental error.

In this instance, the error in the trial court's instructions to the jury did not properly place the burden of proof; thus, the appellant was deprived of his Federal, if not State, constitutional right to receive a fair trial.

What can be more egregious in a trial court's charge to the jury than this kind of error? What is more violative of due process or due course of law than the error in the charge that is before us?

In *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), also see *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), the Supreme Court held that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." 421 U.S., at 704, 95 S.Ct., at 1892, 44 L.Ed.2d, at 522.

To me at least, this requires that a jury must be properly instructed by the trial court when the evidence raises the issue of sudden passion.

In all due respect to the majority, if it does not intend to subscribe to decisions of the Supreme Court, when they control the disposition of an issue, it should say so in bold print and not pussy foot around. Before it does so, however, I caution it to read the provision of Article VI of the Federal Constitution, which provide that when the Supreme Court has decided an issue on Federal Constitutional grounds, such decision is the Supreme Law of the Land; "and judges in every State shall be bound thereby."

The error in the trial court's charge is error of Federal Constitutional dimension, and not, at this time, error of State Constitutional dimension.

Believing that I have stated enough, and without further fulminating over the subject or elongating this opinion, I will cease writing.

I respectfully concur and dissent.

## DISSENTING OINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW.

CLINTON, Judge.

In the Austin Court of Appeals not only was it the State that suggested fundamental error in the charge, but also, and probably for that reason, the State opted not to reply to the ground of error raising sufficiency of evidence, so Justice Smith did not discuss it in great detail. After alluding to

earlier drinking bouts elsewhere, what the court then found factually was succinctly stated, *viz:*

"Upon return to their apartment, the deceased grabbed appellant, threw her on a couch, and threatened to beat her head in. He did beat her on her head. She screamed for help. A neighbor, on hearing the screams, went to the apartment, saw the deceased standing over appellant, and was asked by appellant to not let the deceased hit her. The neighbor grabbed the deceased. Appellant then went to the bathroom, was gone only eight or ten seconds, and returned with a gun. At this time she shot the deceased. The fact that appellant had been beaten was confirmed by a police officer and a physician."

The court followed that factual recitation with its legal conclusions:

"Thus, sudden passion was clearly raised. From a review of the record we are convinced and hold that the State failed to disprove sudden passion beyond a reasonable doubt."

In Part I the majority opinion presents its own elongated factual version, editorializing somewhat along the way.[1] Then in Part II, at pages 211–212, it purports an analysis of evidence regarding voluntary manslaughter: A selective portion of her testimony does not raise sudden passion, but that of witnesses about her earlier reaction to deceased's behavior elsewhere (said to be "former provocation," but was it "immediate"?) coupled with the "alleged beating" is sufficient to raise the issue of sudden passion. Nonetheless, it is opined, "Appellant herself refuted any claim of

voluntary manslaughter," and it "was an *afterthought.*"[2]

In that fashion the developing salutary policy of this Court to give deference to factual findings made by a court of appeals is shattered, and we are treated instead to the old saw that "this Court will not substitute its judgment for that of the jury." Yet it will substitute its judgment on the facts for that of a court of appeals.

The majority opinion says while the evidence is sufficient to raise the issue of voluntary manslaughter, "there was more than sufficient evidence to convict appellant of murder." Of course there is: voluntary manslaughter includes elements of murder plus sudden passion; otherwise the court would not have charged on voluntary manslaughter and it would not be in the case. When it is in the case, that evidence shows murder does not *ipso facto* rule out sudden passion. The majority opinion undertakes to demonstrate that by her testimony *appellant* did not prove sudden passion. But "when the evidence raises the issue of 'sudden passion,' its negation becomes an 'implied element' of murder," *Bradley v. State,* 688 S.W.2d 847, 851 (Tex. Cr.App.1985). So what and where is that evidence by which the State disproved sudden passion beyond a reasonable doubt?

The charge failed to authorize the jury to find whether the State had discharged its burden to disprove an implied element of murder. Therefore, we will never know what the jury believed about "sudden passion." On that point there is no judgment of the jury for this Court to substitute its own. Though the trial court plainly erred, *Cobarrubio v. State,* 675 S.W.2d 749 (Tex.

---

1. A favorite is "appellant claimed" this or that in juxtaposition with what a witness testified. Then there is "alleged beating," "attempted to paint," "no evidence indicating [what] one would expect" and other expressions of doubt about truthfulness of her testimony. (My own treatment of germane testimony is appended hereto.)

2. In that connection it should be noted that for the purpose of his testifying *inter alia* about "the general emotional and character makeup of the defendant, which is in fact one of the elements

other than the murder of the voluntary homicide ... a *sudden passion* consideration," appellant called a *court appointed* psychologist who had run a series of tests on her. The judge allowed counsel to question the psychologist generally along those lines, but when he came to put more pointed questions counsel could not frame a proper one; so when State's objection was sustained counsel simply gave up. Still the matter was argued by counsel for both sides. See appendix. (All emphasis is mine throughout unless otherwise indicated.)

Cr.App.1983), the majority opinion concludes from its own findings of fact that the error is of little moment in light of *Almanza*.[3] However, its approach is errant, and to that I now turn.

At the outset to be stressed is that there is more than one concept of "fundamental error." At least two are implicated in this discussion: one is an error duly and properly preserved for appellate review that is "fundamental" in nature; the other is an error *not* preserved for appellate review that is so basically or fundamentally wrong an appellate court may still review it.

Though it is true that since there was an objection in *Cobarrubio*, whether the error was "fundamental" in its latter incarnation was not an issue. However, as just observed, an error in the jury charge may be "fundamental" in more ways than one. Moreover, in deciding whether objected to charge error is reversible this Court may, and often did, evaluate the character and gravity of the error. One need only review some of the earlier decisions cited and discussed in Part I A and B of *Almanza* to understand the common practice of the Court in this regard. It did not limit itself to finding some minimal degree of error and was free to express its evaluation in terms of the highest kind of reversible error. This Court still is.

In *Cobarrubio* we said that "this error precipitated *a denial of due process of law in the most FUNDAMENTAL sense*," *id.*, at 752. Thus, "*Cobarrubio* error" is constitutional error, just as recognized in headnote 1 and by opinion in several decisions collected under it in Texas Digest. So did all judges more than two years ago in

*Jenkins v. State*, No. 64,004, delivered February 16, 1983, but still pending on rehearing. In this very cause, as well as *Cobarrubio*, the Austin Court of Appeals relied on three decisions by the Supreme Court of the United States to underscore its own determination that fundamental error of constitutional dimension was presented by the State. The strength of that assessment by the Court in *Cobarrubio* is not weakened by the mere fact that it was made in the context of an objection to the charge.

Though "*Cobarrubio* error" not preserved for appellate review "would have necessitated automatic reversal" under one group of decisions classified in *Cumbie* as fit and proper for appellate consideration and reversal, it does not follow that "*Cobarrubio* error" *qua* error is no longer "a denial of due process in the most fundamental sense," *id.*, at 753. Overruling *Cumbie* did not serve to change the nature and character of an error. Thus, at this point the premise on which a part of the majority opinion is based and proceeds is flawed.[4]

The term "actual egregious harm," underlined whenever used in the proposed opinion, simply does not appear in *Almanza;* and to concoct and emphasize it will raise even more questions of what *Almanza* is all about. It overrules *Cumbie* only "[t]o the extent that it holds any charge error requires 'automatic' reversal," *Almanza*, at 174; we did not purport to say errors catalogued in *Cumbie* are no longer "reversible." Indeed, our remand to the Fort Worth Court of Appeals was "to make

---

**3.** The majority opinion has this Court review *sua sponte* the holding below. The reason the State has not challenged that holding is that in the court of appeals it was the district attorney who commendably called attention to the likelihood there was fundamental error in the charge. See page 215, *ante*.

Shortly before the Court recessed we remanded at least a dozen causes to courts of appeals for reexamination in light of *Almanza*. Today the majority takes on the chore, though why this Court should do so in this particular cause is not explained. Consistent with our recent uni-

form policy, I would remand for that consideration.

**4.** Furthermore, in quoting from *Almanza* it skips around in such a way as to create misunderstandings reminiscent of other critical comments about the opinion. Some of Part II is placed ahead of part of Part I C, and in the former on page 8 there is reproduced an account of what courts did and said under the law before and around the turn of the century—our effort to justify the conclusion that preceded it, not to state what the law is today.

such examination in light of considerations expressed in *part II* of this opinion," *ibid.*

Let it be clearly understood that an egregious error must first be found before an appellate court takes the next step "to make an evidentiary review along the lines of that described in *Davis*" and to review any other pertinent part of the record for actual harm. But obviously there are some errors so egregious that such a review will not save them. Nowhere in *Almanza* did we say, "This Court no longer recognizes per se reversible jury charge error," as intimated in the majority opinion.[5]

In his dissenting opinion Judge Teague argues that *Cobarrubio* error already qualifies for a sort of per se treatment, just as he did in *Moore v. State,* 694 S.W.2d 528 (Tex.Cr.App.1985.[6] But let us suppose that, for reasons deemed fit at the time, a trial judge does charge on voluntary manslaughter but fails to place on the prosecution its burden of proving lack of sudden passion in the paragraph applying the law of murder to the facts of the case, and upon review an appellate court determines that there is absolutely no evidence whatsoever of sudden passion. Given those circumstances, though the error is egregious in that it did not properly fix the burden of proof, surely one would not seriously contend that reversal should follow in the premises.

When there is some evidence, however, an appellate court must look to that which in the whole record bears on the matter.

---

**5.** For example, little examination of a record is needed for an appellate court to conclude that an accused has been denied a fair and impartial trial when a jury charge utterly fails to apply germane law to the facts of the case and, therefore, does not instruct the jury under what circumstances it should convict and under what circumstances it should acquit. *Harris v. State,* 522 S.W.2d 199, 202 (Tex.Cr.App.1975). As appellate courts continue to find in a number of cases the same egregious error in jury charges, more than likely we will develop other examples of patent harm that cannot be excused by the record.

**6.** In *Moore* a majority said where *Cobarrubio* error is raised the question is "whether the trial court 'fundamentally erred' in giving a charge on voluntary manslaughter," 694 S.W.2d at 530.

*Almanza,* at 174. In its abstract interpretation of that aspect of *Almanza* the majority opinion is correct. An appellate court is to "make an evidentiary review along the lines of that described in *Davis*" et cetera, *ibid.* Though it did not have "the benefit of our holding in *Almanza,*" the Austin Court of Appeals did review the evidence—certainly it so stated on pages 3 and 5 of its opinion, *viz:*

"The fundamental error committed in the trial court's charge leaves us with no alternative, *under the facts of this appeal,* other than to reverse the judgment of conviction."

"Thus, sudden passion was clearly raised. *From a review of the record* we are convinced and hold that the State failed to disprove sudden passion beyond a reasonable doubt."

In *Davis* the complaint on appeal was that the charge failed to instruct the jury on "second degree" murder. On rehearing the *Davis* court refined the questions presented on an evidentiary review into a positive statement of the rule it actually ended up applying in that case, *viz:*

"[I]n the absence of exceptions to the charge of the court, for this court to reverse, the evidence tending to present a phase of the case or theory favorable to the accused must be so pertinent and favorable [sic. "forcible"?] that it might reasonably (not possibly) be supposed that the jury could be influenced by it in arriving at their verdict."

---

Like Judge Teague, I believe an appellate court should not "review the record on appeal in order to 'second guess' a trial judge's decision to give an *unobjected to instruction*" on voluntary manslaughter, Dissenting Opinion, p. 215. Compare *Bradley,* supra. Having given an instruction on voluntary manslaughter, consonant with *Cobarrubio* a trial court ought also to modify its instruction on murder. But if not modified accordingly, then as a matter of appellate review it is relevant to determine whether the evidence is sufficient to have required that the authorization paragraph on murder place on the State its burden of proving the lack of sudden passion. Thus, the issue lies in a failure to give a correct instruction on murder, not in giving one on voluntary manslaughter.

*Id.,* 13 S.W. at 997.[7] But even if that rule is applied to an error of omission in failing to instruct on the State's burden of proof, that Justice Smith and two other capable, experienced judges were "convinced" from the record persuades me that one may reasonably suppose that the jury in this cause could be influenced by the evidence of sudden passion in arriving at its verdict—had it been properly charged under *Cobarrubio.*

I dissent to the egregious harm inflicted by the majority opinion.

### APPENDIX

I demonstrate my concerns about the factual version in the majority opinion from the point where appellant drove deceased home by inserting here and there in Part I and underscoring relevant testimony from the record. Thereafter I attach hereto some reproduced portions of the jury argument regarding sudden passion.

*Lawrence—3*

Appellant drove deceased home. She testified that the deceased was hostile and angry because appellant refused to apologize to the "woman." Appellant enlisted the assistance of Paul Miller, a next door neighbor, in getting the deceased out of the car and into the house.

*Within a few minutes appellant returned to her neighbors with a plate of "two big old pieces of ham," apologizing all the while, saying she was sorry that she had awaken them and gotten them up.* (Graves, SOF 45)

According to appellant's testimony, she was cleaning up when the deceased grabbed her and threw her on the couch and started beating her with his fist. She screamed—*it sounded "like a scream of*

*fear"* (Graves, SOF 62)—and Paul Miller and Martha Graves, Paul Miller's roommate, came running over. Appellant claimed to have no recollection of the events following Paul Miller's entrance to the apartment. All appellant could recall was that when the deceased was beating her she was scared—*"I was in fear of my life,"* and thought that was the reason *why she shot deceased, is the way she put it.* (Appellant, SOF 157, 146)

Miller and Graves both testified that when they entered the apartment appellant was on the couch, *"just kind of crunched up" or "crumpled," Graves said, (SOF 48, 60, 61) and the deceased was standing five to seven feet away. Graves walked over to appellant.* (Graves, SOF 49) *Appellant was crying, and her eyes became red.* (Graves, SOF 72) *"Act[ing] like she was afraid,"* (Graves, SOF 62) Appellant yelled "Paul, keep him away from me" *or "Don't let Kenneth hit me."* (Miller, SOF 194) *Deceased "had started walking over toward her," taking "a step toward her, staggering;"* (Graves SOF 50 and 65–66) and, *saying, "Okay, I won't."* (Miller, SOF 194) Paul Miller grabbed the deceased *by the arm and told him to "be cool;"* he said, "No, Ken, be cool ... just don't get *yourself in no trouble."* (Graves, SOF 50, 68; Miller, SOF 195, 211) *Martha Graves was by appellant. "Because [she] could tell they were having an argument," Martha Graves asked appellant "to come and spend the night with [her]."* (Graves, SOF 51). Martha Graves heard the deceased say "shut up, or I'm going to knock your damn head off."[3] *The coffee table was jammed next to the couch.* (Graves, SOF 50) At this point appellant walked over to (Graves, SOF 50) the couch, *"walked around this way"* (Graves, SOF 50) and

---

**7.** In pointing out that treatment of the matter on rehearing, I do not mean to suggest that the questions listed in the opinion on original submission are not valid ones in a given cause. The purpose is to show that in the mind of Judge Hurt, who wrote both, and the two concurring judges, posing those questions does not exclude other expressions of the review process where asserted error by omission pertains to a defensive theory. That is one reason *Almanza*

says "evidentiary review *along the lines* of [Davis]."

**3.** Paul Miller did not recall hearing this threat, *however he did testify that deceased "pointed at Betty [and] mumbled something, but ... I couldn't make out what it was."* (Miller, SOF 194, 207, 208)

into a bathroom where she retrieved her revolver. She entered the room and fired 2 shots, one of which fatally struck the deceased in the stomach. Paul Miller further testified that when appellant fired the first shot *or pointed the gun* (Miller, SOF 197, 199) he shoved the deceased behind him *or pushed him backwards* (ibid.) and out of the way *and appellant pulled the trigger and fired.* (Miller, SOF 199–200) Appellant in turn took a step around Paul Miller *or Miller grabbed deceased because he was going backwards and she moved around in front of deceased and pulled the trigger again* (Miller, SOF 200, 202) and shot a second time, this time hitting the deceased *who grabbed his stomach.* (Miller, SOF 202, 203) Miller and Graves left immediately. Appellant assisted the deceased outside the apartment. *She went to her neighbors again, banged on the door and said, "Paul, Martha, call the police. I shot Ken."* (Miller, SOF 205) Police were called immediately, and upon their arrival found the appellant sitting on the ground holding deceased's head in her lap. An emergency room doctor testified that the deceased died of massive bleeding due to the gunshot wound, and furthermore that deceased's blood-alcohol content measured .221 milligrams per cent by weight and that .500 milligrams would be lethal to most people.

*Lawrence—4*

Neither the eyewitnesses nor the investigating officers noticed any bruising on appellant the night of the offense. *However, Officer Longwell candidly stated, "I could honestly not tell you if I could have noticed any marks …, I could not have probably noticed them at the time."* (Longwell, SOF 25) *Officer Burton described what appellant was wearing and when asked generally whether he "notice[d] anything else about her," answered "No, sir. Not that I could see."* (Burton, SOF 33) A police officer, who was a personal friend of appellant and the deceased, *and who was on duty Thursday evening August 2, removed appellant from her jail cell and escorted her to a visitors room; he observed "some swelling around the right cheek, a little bit of darkening, bruises and so forth around the chest area and up around the neck,"* (Stephens, SOF 216) noticed a large bruise on appellant at around 10 p.m., some twenty hours after the shooting and alleged beating. *On Saturday morning while appellant was out of her cell smoking and drinking coffee, Officer Stephens observed that "on both arms, around the elbow area and on the upper arm on both sides were bruised. And bruises around the neck and around the upper chest and the face were very visible at that time," being "bluish purple" and "dark."* (Stephens, SOF 219) *Several days later after she had been released bruises were evident.* (Stephens, SOF 222) A doctor who examined appellant *5 days* [sic] after the shooting found bruising that was consistent with appellant having been injured 3–7 days *or 3–5 days* (Whitten, SOF 229) *before* [sic] the examination. *The doctor found "considerable bruising" of "blue discoloration" "along the right side of the jaw," and he explained that after injury "it would take about two to three days" for discoloration to begin;* (Stephens, SOF 229) *he took X rays,* (Appellant, SOF 160) *and from his examination the doctor thought "there was a possibility of a fracture," so he referred appellant to a dentist. (Stephens, SOF 230). He expressed the opinion that "it would require a blow of say sizeable force to cause a bruise of that nature," (ibid.) and that appellant "was injured and in some pain" when he saw her.* (Stephens, SOF 232.)

(As content of the remaining paragraph is more conclusory than factual, to treat this material is hardly worth the candle. Suffice to say that by drawing from appellant brief statements that deceased had struck her before counsel was not trying to show he was a violent man generally but to contrast "any other time" with the beating he gave her Thursday morning. See, e.g., SOF 141–142, 146, 161. In fact, though appellant said "at times" deceased was "a violent man," she explained that "he always thought when he was drinking he could beat anybody," but while "he would

argue at lot ... he never fought." SOF 147. Certainly in argument counsel did not "attempt" to paint a picture of the deceased as a violent man: "They had had a few squabbles, he'd even hit her before with an open hand, elicited by Mr. Allison. No problem." SOF 292, 298. It was the prosecuting attorney who contended appellant and her lawyer wanted to do that, *viz:* "[They] want to paint you a picture of a poor, down-trodden, beaten helpless woman who could not take care of herself and live with a man out of fear or love, and I don't know which one it is." (SOF 302.) In the event, what difference does it make?)

ARGUMENT BY MR. ALLISON

EVIDENCE, BOTH TESTIMONIAL AND PHYSICAL IN THE FORM OF EXHIBITS THAT WE HAVE INTRODUCED, YOU WILL ABLE—YOU WILL BE ABLE TO COME TO A VERDICT IN THIS CASE. NOW, JUST IN A NUTSHELL WHAT THIS CASE IS IS FIRST OF ALL, TWO PARAGRAPHS CHARGING HOMICIDE. NOW, THESE ARE THE TWO PARAGRAPHS IN THE INDICTMENT THAT CHARGE THE OFFENSE OF MURDER. FIRST OF ALL, THE ELEMENTS ARE LISTED AS TO THESE PARAGRAPHS. LET ME STATE RIGHT NOW THAT EACH ONE OF THESE PARAGRAPHS— EACH, IF PROVEN BY THE STATE CONSTITUTES THE OFFENSE OF MURDER. WE MUST PROVE THAT THE DEFENDANT IN THIS CASE, IN BELL COUNTY, STATE OF TEXAS, ON OR ABOUT THIS DATE, INTENTIONALLY AND KNOWINGLY CAUSED THE DEATH OF KENNETH TRUMBLE BY SHOOTING HIM WITH A GUN. THESE ARE THE SIX ELEMENTS THAT I TALKED TO YOU ABOUT ON VOIR DIRE, THAT THE STATE HAD THE BURDEN TO PROVE BEYOND A REASONABLE DOUBT, TO PROVE TO YOU THAT THE DEFENDANT SITTING IN COURT TODAY, BETTY LAWRENCE, COMMITTED THE OFFENSE OF MURDER. THESE SEVEN ELEMENTS CONCERN THE SECOND PARAGRAPH OF WHETHER OR NOT THE DEFENDANT, IN THE COUNTY OF BELL, STATE OF TEXAS, ON THIS DATE, INTENDING TO CAUSE SERIOUS BODILY INJURY TO KENNETH TRUMBLE, COMMITTED AN ACT CLEARLY DANGEROUS TO LIFE BY SHOOTING HIM, KENNETH TRUMBLE, WITH A GUN, CAUSING THE DEATH OF KENNETH TRUMBLE. THERE ARE TWO WAYS UNDER THE LAW OF THE STATE OF TEXAS—TWO WAYS OF PROVING THE OFFENSE OF MURDER. THEY ARE THE SAME DEGREES. THEY'RE FIRST DEGREE FELONIES. NOW, THE DEFENSE HAS RAISED THE ISSUE, AND THE ISSUE IS IN THE CHARGE, OF VOLUNTARY MANSLAUGHTER. THERE ARE TWO DEFINITIONS THAT YOU NEED TO BE CONCERNED WITH. SUDDEN PASSION, BECAUSE IN ORDER FOR VOLUNTARY MANSLAUGHTER TO BE APPLIED TO THESE TWO PARAGRAPHS, YOU MUST FIND THAT THE CAUSE OF DEATH WAS MADE UNDER THE INFLUENCE OF A SUDDEN PASSION ARISING FROM AN ADEQUATE CAUSE. SO YOU HAVE TWO TERMS. THEY ARE DEFINED FOR YOU. FIRST OF ALL, SUDDEN PASSION AND ADEQUATE CAUSE. SUDDEN PASSION IS DEFINED AS BEING PASSION DIRECTLY CAUSED BY AND ARISING OUT OF PROVOCATION BY THE INDIVIDUAL KILLED OR ANOTHER ACTING WITH THE PERSON KILLED, WHICH PASSION ARISES AT THE TIME OF THE OFFENSE AND IS NOT SOLELY THE RESULT OF FORMER PROVOCATION. ADEQUATE CAUSE MEANS CAUSE THAT WOULD COMMONLY PRODUCE A DEGREE OF ANGER, RAGE, RESENTMENT OR TERROR IN A PERSON OF ORDINARY TEMPER SUFFICIENT TO RENDER THE MIND INCAPABLE OF COOL REFLECTION. THERE ARE— THE TERMS HERE ARE LEGAL AS I TOLD YOU ON VOIR DIRE. AND AS YOU GO BACK INTO THE JURY ROOM, DON'T LEAVE YOUR COMMON SENSE OUT HERE OR YOUR REASONABLENESS ABOUT YOU. BUT APPLY YOUR EVERYDAY COMMON SENSE REASON-

ING TO THE LAW AS APPLIED AND STATED IN THIS CHARGE. IN OTHER WORDS, DON'T BURDEN YOURSELF DOWN WITH TRYING TO PICK APART THE LEGAL TERMS. READ THE CHARGE AND TRY TO UNDERSTAND IT, AND HOPEFULLY YOU WILL, BUT APPLY YOUR COMMON SENSE AND REASONING TO IT AS YOU READ IT, AND AS YA'LL COLLECTIVELY TALK ABOUT THE EVIDENCE IN THIS CASE. AND SO VOLUNTARY MANSLAUGH-TER REALLY MEANS THAT ALL OF THE ELEMENTS THERE ARE TRUE. THAT EACH ONE IN PARAGRAPH—EACH ELEMENT IN PARAGRAPH ONE, THE SIX, ARE TRUE, AND EACH OF THE SEVEN IN PARAGRAPH TWO ARE TRUE. BUT THAT SHOOTING AND THAT KILLING CAME ABOUT BE-CAUSE THERE WAS AN INFLUENCE OF A SUDDEN PASSION ARISING FROM AN ADEQUATE CAUSE. I WANT YOU TO BE AWARE OF THE TWO TERMS THAT I'VE DISCUSSED WITH YOU, SUDDEN PASSION AND ADEQUATE CAUSE. NOW, SELF DE-FENSE BECAME AN ISSUE IN THIS CASE, AND YOU ARE TO CONSIDER THAT TOO UNDER THE LAW. I WANT YOU TO BE AWARE OF THE LAW OF SELF DEFENSE. THE COURT HAS SET OUT THE LAW IN RELATION TO SELF DEFENSE IN ALL SHOOTING CASES, IN ALL HOMICIDE CASES, AND IT'S STANDARD. AND IT SETS OUT THAT A PERSON IS JUSTIFIED IN USING FORCE AGAINST ANOTHER WHEN AND TO THE DEGREE HE REASON-ABLY BELIEVES THE FORCE IS IMME-DIATELY NECESSARY TO PROTECT HIMSELF OR HERSELF AGAINST THE OTHER PERSON'S USE OR ATTEMPT-ED USE OF UNLAWFUL FORCE. IN THIS CASE, WE HAVE THE ·USE OF DEADLY FORCE BY THE DEFENDANT IN THIS CASE. A PISTOL, WHICH IS CAPABLE OF INFLICTING DEATH OR SERIOUS BODILY INJURY. NOW, A PERSON IS JUSTIFIED IN USING DEADLY FORCE IN THIS CASE WHEN HE OR SHE REASONABLY BELIEVES THAT SUCH FORCE IS IMMEDIATELY NECESSARY. AND I STRESS THE TERM OR THE WORD IMMEDIATELY NECESSARY, TO PROTECT HIMSELF AGAINST THE OTHER PERSON'S USE OR ATTEMPTED USE OF UNLAWFUL DEADLY FORCE. AND THERE ARE TWO THINGS THAT MUST BE PRESENT FOR A PERSON TO BE ABLE, UNDER THE LAW, TO USE DEADLY FORCE IN SELF DEFENSE, TO PRO-TECT HIMSELF AGAINST

. . . . .

ARGUMENT BY MR. HARRIS

HOLLARING. THE H—HE MAN, GOT-TA BEAT UP ON A WOMAN. AND WE WILL TAKE THE Y ON THE END OF IT FOR YIELDING. BETTY LAWRENCE HAD YIELDED AS FAR AS SHE COULD GO. IF YOU CONSIDER IT FROM THAT ASPECT, IT CAN ONLY LEAD TO ONE CONCLUSION. HOW FAR DO YOU HAVE TO RETREAT BEFORE YOUR TURN COMES TO PROTECT YOUR-SELF? HAVING SAID THAT, LET ME TALK AND MENTION THAT SELF DE-FENSE IS THE ISSUE HERE. DID SHE ACT IN SELF DEFENSE TO PRESERVE HER LIFE AND LIMB FROM SERIOUS BODILY INJURY OR DID SHE CROSS THE IMAGINARY LINE FROM REA-SONABLE FORCE TO DEADLY FORCE TO KILLING? THAT'S REALLY WHAT IT COMES DOWN TO. YOU KNOW, NOT ALL KILLING UNDER THE LAW IS MURDER. BECAUSE OBVIOUSLY, THERE'S MURDER AND VOLUNTARY MANSLAUGHTER, BECAUSE THAT'S TWO OF THE ISSUES TODAY, AND THEN THERE'S INVOLUNTARY MAN-SLAUGHTER, AND I THINK THERE MAY EVEN BE JUSTIFIABLE HOMI-CIDE. BUT THEY ALL DEAL WITH DEATH. NOW, YOU ARE CONSIDER-ING TWO OF THE THREE, OR TWO OF THE FOUR. SO LET ME—LET ME KIND OF RUN DOWN THROUGH WHAT—THE EVIDENCE. I KNOW YA'LL HEARD AS WELL AS I DO. AND REMEMBER AS I'M GOING THROUGH THIS, THINK BACK TO WHAT THESE PEOPLE WERE TELLING YOU, HOW

CERTAIN ASPECTS WERE PRESENTED TO YOU. THE STATE CALLED SIX WITNESSES IN THEIR CASE IN CHIEF, IF YOU WANT TO CALL IT, THE INITIAL PART OF IT, BEFORE I PRESENTED MY EVIDENCE. THE FIRST THREE WERE POLICE OFFICERS. THE FIRST ONE WAS A SERGEANT LONGWELL. PRIMARILY HIS RESPONSE WAS I RESPONDED TO A CALL, SHOTS FIRED, MAN DOWN, I THINK TO QUOTE THE GENTLEMAN'S

. . . . .

HE PROBABLY HAD THE EASIEST JOB OF ALL. THEY HAD THE GUN, THE SUSPECT, THE VICTIM, TWO ABSOLUTE EYE WITNESSES, AND THE STATEMENTS OF BETTY LAWRENCE THAT SHE DID THE SHOOTING. I MEAN IT WAS AN OPEN AND SHUT CASE, LITERALLY. THERE WAS NO WORK TO BE DONE, NO SLEUTHING THROUGH DARK ALLEYS, NO FINGERPRINTS TO BE LIFTED, NO STAKEOUTS TO BE CONDUCTED. IT ALL OCCURRED IN A BRIEF TIME SPAN. THE REASON OCCURRED, THE SHOT WAS FIRED, THE CRIME WAS SOLVED, AND IT PROBABLY DIDN'T TAKE FIFTEEN MINUTES. NOT AS LONG AS I'LL TALK TO YOU TODAY, THIS WHOLE MATTER RESOLVED ITSELF. I MENTIONED TWO EYE WITNESSES. MR. ALLISON CALLED ONE, MARTHA GRAVES. THERE ARE REALLY THREE PEOPLE WHO KNOW MORE ABOUT THIS SINGLE CASE THAN ANY ONE ELSE, PAUL MILLER, MARTHA GRAVES AND BETTY LAWRENCE. IF YOU WILL THINK BACK ON IT, THE DEFENSE PRESENTED TWO OF THOSE THREE WITNESSES. GRANTED, THE DEFENDANT CANNOT BE COMPELLED BY THE STATE TO TESTIFY AGAINST THEMSELVES, BUT THE STATE CERTAINLY HAD ACCESS TO BOTH EYE WITNESSES, AND COULD HAVE CALLED THEM. THEY DID NOT. I CALLED PAUL MILLER. THE DEFENSE CALLED PAUL MILLER. BECAUSE WE FELT THAT EVEN IF IT WAS AN ABSOLUTE TOTALLY REPETITIOUS ACCOUNT OF WHAT MARTHA GRAVES HAD SAID, IT WAS STILL IMPORTANT EVIDENCE FOR YOU TO CONSIDER. I'D LIKE TO RUN DOWN THROUGH A BRIEF SCENARIO OF WHAT MARTHA GRAVES SAID. SHE STATED THAT SHE HAD SEEN THE DEFENDANT AND KEN EARLIER AT THE HITCHING POST, EARLIER IN THE DAY, TWO OR THREE O'CLOCK IN THE AFTERNOON. SAID SHE SAW THEM RIGHT BEFORE SHE WENT HOME. SHE DID NOT SEE THEM AGAIN UNTIL TWO O'CLOCK IN THE MORNING, AT WHICH TIME BETTY LAWRENCE WAS KNOCKING ON HER DOOR, PROBABLY LOUDER, BUT IN THAT FASHION, SAYING CAN YOU HELP ME. AND MARTHA GRAVES ANSWERED THE DOOR, AND WHEN SHE CAME TO THE DOOR, SHE ASKED FOR PAUL MILLER. AND WHY DID SHE NEED PAUL MILLER? BECAUSE KENNETH TRUMBLE WAS SO DRUNK HE COULDN'T GET OUT OF THE TRUCK. SIMPLE AS THAT. PAUL SAYS, WELL, HE COULD WALK, BUT IF I HADN'T GUIDED HIM, HE NEEDED A LITTLE GUIDANCE, YOU KNOW. GOT HIM INSIDE. MARTHA SAYS THEY WERE BACK IN OH, MAYBE A FEW MINUTES MAYBE LONGER. BACK IN THEIR APARTMENT, THEY HEARD A SCREAM. NOT A MAN'S SCREAM, NOT A LAUGHTER, A SCREAM. NOW, I CAN'T SCREAM. I PROBABLY COULDN'T MIMIC IT EVEN IF I WANTED TO FOR THE SHOCK EFFECT, BUT IT WAS SUFFICIENT TO BE HEARD IN THE NEXT APARTMENT, AND TO CAUSE THEM TO IMMEDIATELY VACATE WHERE THEY WERE AND GET NEXT DOOR. THAT IS NOT A SCREAM LIKE HEY YOU, OR HELLO. IT HAS GOT TO BE A SCREAM OF TERROR OR A SCREAM OF FEAR. PEOPLE DON'T REACT TO OTHER SCREAMS. PEOPLE HOLLAR AT FOOTBALL GAMES ALL THE TIME, BUT THEN YOU JUST CONSIDER THEM A NUISANCE. WHEN SOME-

BODY SCREAMS AT TWO O'CLOCK IN THE MORNING, IT'S EITHER FOR JOY OR FOR FEAR, AND OBVIOUSLY, THIS ONE HAD TO BE FOR FEAR. THEY WENT NEXT DOOR. PAUL MILLER WENT THROUGH THE DOOR FIRST. BETTY LAWRENCE IS ON THE COUCH IN A SCRUNCHED UP POSITION. I HAD A LITTLE TROUBLE FIGURING THAT WORD OUT. I ASKED THE SAME GENTLEMAN SITTING ON THIS CORNER TO PLEASE HELP ME. AND HE DID. AS YOU RECALL HE HAD HIS KNEES PULLED UP, HE WAS SLIGHTLY TILTED WHAT WOULD BE TO HIS RIGHT. NOT LAYING DOWN, NOT SITTING UP. I SAID WHAT HAPPENED THEN. PROBABLY TWO OR THREE PIECES OF CONVERSATION, MAX. BETTY LAWRENCE SAID PAUL, KEEP HIM AWAY FROM ME. KEN RESPONDED WITH IF YOU DON'T SHUT UP, I'M GOING TO KNOCK YOUR DAMN HEAD OFF—OBVIOUSLY THE WORDS OF A LOVING, CARING PERSON. IT DOESN'T SOUND LIKE IT TO ME. PAUL—AND I ASKED PAUL SPECIFICALLY. NOW, MARTHA GRAVES SAID HE ONLY PLACED HIS ARM OUT. I ASKED PAUL YESTERDAY, AND I STOOD IN FRONT OF YOU, LADIES AND GENTLEMEN OF THE JURY, HE PUT BOTH HANDS ON BOTH OF MY ARMS. I ASKED HIM HOW DID KENNETH TRUMBLE COMPARE IN SIZE TO ME, AND HE SAID ABOUT THE SAME SIZE. I'M NOT LITTLE, I'M NOT BIG, BUT ABOUT MY SIZE WILL GIVE YOU AN IDEA. YOU'VE SEEN THE DEFENDANT WALK IN AND OUT OF THE COURTROOM. YOU CAN UNDERSTAND THE RELATIVE SIZE. AT THAT MOMENT, MARTHA GRAVES SAID BETTY, DO YOU WANT TO COME SPEND THE NIGHT WITH US. NOW, WHY WOULD SHE ASK THAT IF SHE DIDN'T THINK THAT THERE WAS SOME REASON THAT BETTY LAWRENCE SHOULD BE EXTRACTED FROM THAT DANGEROUS SITUATION? AM I BEING ILLOGICAL? THEY HEAR THE SCREAM, THEY COME TO THE DOOR, PAUL MILLER RESTRAINS HIM, AND SHE ASKS TO SPEND THE NIGHT NEXT DOOR? WHY? LOGIC SAYS BECAUSE THERE WAS FEAR, THERE WAS CONCERN, THERE WAS WORRY. OR MAYBE THEY JUST DON'T LIKE HER SCREAMING IN THE MIDDLE OF THE NIGHT. I DON'T KNOW, BUT TO ME THE LOGIC POINTS THAT THEY THOUGHT THERE WAS AN EXPLOSIVE, HYPERTENSION SITUATION. BETTY DIDN'T SAY ANOTHER WORD AT THAT POINT, SHE SIMPLY GOT OFF THE COUCH, WALKED IN THE KITCHEN—CORRECTION— WALKED IN THE BATHROOM, PICKED UP A TWENTY-TWO REVOLVER, WALKED IN AND SHOT HIM. I'D LIKE TO COLOR IT A LOT OF DIFFERENT WAYS, BUT THAT IS A TOTAL SCENARIO RIGHT THERE. I ALSO ASKED MARTHA GRAVES HOW LONG DID THIS TAKE, COULD YOU GIVE IT TO ME IN SECONDS OR MINUTES? SHE SAID ABOUT THIRTEEN SECONDS. THIRTEEN SECOND IS NOT VERY MUCH TIME. YOU KNOW, WE'RE TALKING ABOUT TWO MONTHS AGO. I CAN'T HOLD HER TO THIRTEEN SECONDS, BUT I THINK YOU CAN UNDERSTAND MY POINT. THIS IS NOT A LONG PROTRACTED THING. I'VE NOW BEEN TALKING TO YOU FOR ELEVEN MINUTES— TWELVE MINUTES. AND YOU REALIZE HOW LONG I'VE BEEN TALKING, SO THIS—THESE EVENTS DIDN'T OCCUR OVER, YOU KNOW, IN A SLOW MOTION FLOWING TYPE THING. PAUL COMES THROUGH THE DOOR, SHE SAYS KEEP HIM AWAY, MARTHA SAYS YOU WANT TO SPEND THE NIGHT WITH US. KEN SAYS SHUT UP I'LL KNOCK YOUR DAMN HEAD OFF. SHE GETS OFF THE COUCH, GETS THE GUN AND COMES RIGHT BACK THROUGH THE DOOR AND BANG, BANG. SIMPLE AS THAT. AND THERE'S AN INTERESTING POINT RIGHT THERE. MARTHA GRAVES AND PAUL MILLER LEFT THE APARTMENT. WENT BACK TO BED. THEY

HAD JUST WATCHED SOMEBODY FIRE TWO SHOTS FROM A HAND GUN—THIS HAND GUN TO BE EXACT, AND THEY WENT BACK TO BED. IT'S LIKE WELL, I DON'T KNOW, WHERE I LIVE IF SOMEBODY FIRES TWO SHOTS IN THE MIDDLE OF THE NIGHT, I'M GETTING UNDER

·    ·    ·    ·    ·

THING WITH STATISTICS, BUT HER PERSONALITY TESTS, I THINK, SAID SOMETHING. THEY SAID SHE IS A PASSIVE WOMAN IN A CLASSIC FEMINE ROLE, SOMETIMES GIVEN TO IMPULSE. THE PROPER STATE'S ANSWER TO THAT WOULD BE AND IMPULSIVELY SHE GOT THE GUN AND SHOT HIM DOWN. OUR ANSWER TO THAT WOULD BE I WOULD PROBABLY BE IMPULSIVE TOO IF SOMEONE WERE TRYING TO BEAT IN THE RIGHT SIDE OF MY FACE WITH REPEATED BLOWS. HOW MUCH PROVOCATION DO YOU NEED BEFORE YOU DEFEND YOURSELF? THE DEFENSIVE FIRMLY BELIEVES THAT THIS IS A CLASSIC CASE OF SELF DEFENSE. I GUESS IF IT WERE CLASSIC THOUGH, YOU WOULDN'T BE HEARING THE ELEMENTS. IT'S A GRAY CASE OF SELF DEFENSE. BECAUSE ALL OF THE ELEMENTS THAT MR. ALLISON HAS BEEN LISTING HAVE NOT BE REFUTED BY US. SHE DID SHOOT HIM IN BELL COUNTY. WE DISPUTE THE INTENTIONALLY AND KNOWINGLY ASPECT. WE DON'T DENY THE SHOOTING. WE MERELY OFFER YOU THE REASONS, JUST LIKE THE WORD WHY I WROTE UP THERE. JUST LIKE WHY. WILD, HARD HITTING, YIELDING. WELL, HOW FAR DO YOU HAVE TO YIELD? ALRIGHT. THERE'S ALWAYS GOING TO BE SOME QUESTION ABOUT WHEN DID—WHY DOESN'T SHE REMEMBER? I KNOW MOST OF YOU GENTLEMEN HAVE PROBABLY WATCHED PRIZE FIGHTS ON TELEVISION. I HAVE. I DON'T KNOW WHETHER YOU LADIES HAVE OR NOT. OFTEN DURING A FIGHT—

NOT OFTEN, BUT LOTS OF TIMES, SEVERAL TIMES—

MR. ALLISON: YOUR HONOR, I WOULD OBJECT TO HIM GOING OUTSIDE THE RECORD.

THE COURT: OVERRULED

·    ·    ·    ·    ·

AT THAT INSTANT, SHE NEEDED RELIEF. I KNOW WHEN WE WERE ALL CHILDREN GROWING UP, WHEN WE WOULD GET OUTSELVES IN SOME TERRIBLE BIND, WE'D SAY LORD, IF YOU'LL JUST EXTRACT ME FROM THIS. WHY CAN'T I BE DEAD? BECAUSE IT'S NOT THAT I WANT TO BE DEAD, IT'S JUST THAT I DON'T WANT TO BE IN THIS TERRIBLE SITUATION. I'LL DO WHATEVER IT TAKES TO GET OUT OF IT. AND I—YOU KNOW, IT'S EASY—IT PROBABLY TAKES—TAKEN ME QUITE A WHILE TO SAY ALL OF THAT, BUT IT TAKES A MERE MILLISECOND FOR YOUR THOUGHT PROCESSES TO LEARN THAT. PARAGRAPH FIVE ADDRESSES THE VOLUNTARY MANSLAUGHTER ISSUE. IT IS THE DEFENSE'S FIRM POSITION THAT THIS IS A SELF DEFENSE CASE. BUT PARAGRAPH FIVE SAYS THAT IF YOU CANNOT, IF YOU DO NOT FIND THAT, YOU BELIEVE THAT THEIR IS SOME GUILT, BUT NOT NECESSARILY MURDER, THEN YOU WILL HOLD FOR THE LESSER INCLUDED OF VOLUNTARY MANSLAUGHTER. I'LL TOUCH ON THAT ONLY BRIEFLY. SUDDEN PASSION IS THE REQUIREMENT. THE WORDING IN SUDDEN PASSION IS MAD, RAGE, TA-DA-DA-DA, TERROR. AND SO TERROR IT IS—ABSOLUTE FEAR. IF YOU REACT TO ABSOLUTE FEAR, IS THAT NOT A SUDDEN PASSION? HAVE YOU EVER NOTICED THAT A CAT CAN WHIP THREE DOGS WHEN IT'S CORNERED? NOT BECAUSE THE CAT IS MEANER, BUT BECAUSE IT KNOWS TERROR—ABSOLUTE FEAR. SAME PROCESS. THAT IS SUDDEN PASSION. COULD NOT HAVE BETTY LAWRENCE BEEN IN ABSOLUTE TERROR OF ANOTHER BE-

ING? YOU SAY WELL, WAIT A MINUTE, YOU KNOW, SHE HAD BEEN HIT BEFORE. HE HADN'T BEEN DRINKING ALL DAY BEFORE. IT WASN'T TWO O'CLOCK IN THE MORNING BEFORE.

ARGUMENT BY MR. ALLISON

BACK IN THE BATHROOM AND CLOSE THE DOOR BECAUSE PAUL MILLER WAS THERE. SELF DEFENSE, LADIES AND GENTLEMEN, IS A RIGHT THAT WE ALL ENJOY UNDER THE LAW, TO TAKE ANOTHER HUMAN LIFE BECAUSE WE FEEL IN A POSITION THAT WE ARE IN AT THE TIME THAT WE ARE IN FEAR OF SERIOUS BODILY INJURY OR DEATH. THAT WAS NOT PRESENT ON AUGUST THE SECOND AT TWO A.M. LET ME TALK TO YOU ABOUT VOLUNTARY MANSLAUGHTER AND THE SUDDEN PASSION, THE SUDDEN PASSION. THE SUDDEN PASSION IS DEFINED TO YOU. IT TALKS ABOUT PASSION DIRECTLY CAUSED BY AND ARISING OUT OF PROVOCATION BY THE INDIVIDUAL KILLED. WHERE DID THE PROVOCATION REALLY START? BY BETTY LAWRENCE, WHEN SHE CAME IN AND SAW KEN DANCING WITH ANOTHER WOMAN. YOU KNOW, THE DOCTOR TESTIFIED THAT SHE IS AN IMPULSIVE WOMAN. ALSO, THAT PASSION MUST ARISE AT THE TIME OF THE OFFENSE. IT DOESN'T SAY TWO HOURS BEFORE THAT OR TWO AND A HALF HOURS BEFORE THAT, AT TEN-THIRTY WHEN SHE CAME THROUGH THE DOOR OF THE LOUNGE. AT THE TIME OF THE OFFENSE, AND IS NOT SOLELY THE RESULT OF FORMER PROVOCATION. THE DEFENSE ATTORNEY TALKED TO YOU ABOUT ADEQUATE CAUSE AND TERROR—THAT'S FINE. I THINK IN THE PROPER POSITION TERROR COULD BE CONCLUDED TO BE AN ADEQUATE CAUSE. BUT CONSIDER THIS, LADIES AND GENTLEMEN. THERE HAS BEEN A LOT OF TESTIMONY ABOUT BRUISES AND ABOUT FACIAL LACERATIONS AND CHOKE MARKS AND SEVERE BEATINGS—THE DEFENDANT TALKING ABOUT THE SEVERE BEATINGS TO THE RIGHT SIDE OF HER FACE WITH A CLOSED FIST, BUT THIS IS LIVING COLOR OF WHAT THE DEFENDANT LOOKED LIKE ONE DAY AFTER THE SHOOTING, AND SOME OF YOU MAY HAVE THE COMMON SENSE ABOUT YOU TO KNOW THAT A CLOSED FIST HIT BRUTALLY THREE TO FOUR TIMES UPON A PERSON'S FACE IS GOING TO CAUSE A SEVERE SWELLING, AND I HAVE TO STRAIN TO SEE ANY SWELLING IN THESE PHOTOS. YOU LOOK AT THEM, AND ASK FOR THEM AND LOOK AT THEM WHEN YOU GO BACK IN THE JURY ROOM. VOLUNTARY MANSLAUGHTER DOES NOT APPEAR TO BE PRESENT IN THIS CASE EITHER. SHE EXPRESSES THE INTENT TO DO SERIOUS BODILY INJURY TO HIM IN THE CLUB BEFORE CAROL SWAIN. THAT'S AT TWELVE O'CLOCK, TWO HOURS BEFORE THE SHOOTING. THAT'S WHY I FEEL LIKE THAT THE STATE HAS PROVEN ITS CASE AS TO THE SECOND PARAGRAPH IN THE INDICTMENT, THE FACTS IN THIS CASE. SHE INTENDED TO COMMIT AN ACT CLEARLY DANGEROUS TO HUMAN LIFE BY SHOOTING AT HIM WITH A GUN, AND THEREBY CAUSED THE DEATH OF KENNETH TRUMBLE. YOU KNOW THE TESTIMONY OF PAUL MILLER, THEIR WITNESS, WHEN SHE SAID—WHEN PAUL MILLER SAID WHEN SHE CAME IN THE DOOR, SHE HAD THE GUN AND FIRED ONCE, PAUL MILLER PUSHED HIM BACK, PUSHED HIM BACK THIS WAY. WHAT DID BETTY LAWRENCE DO, ACCORDING TO PAUL MILLER? SHE STEPPED TO THE SIDE AND FIRED AGAIN AND HIT HIM IN THE MIDDLE OF THE STOMACH. DOES THAT SOUND LIKE THE ACTIONS OF A PERSON WHO IS IN FEAR OF DEATH OR BODILY INJURY OR A PERSON BENT ON MISCHIEF? A COLD HEARTED SHOOTING IN THE

TIME WHERE ALCOHOL AND JEAL-
OUSLY HAD A MAJOR PART IN IT.
CONSIDER THAT, LADIES AND GEN-
TLEMEN. AND YOU KNOW, WHEN
PAUL WENT THROUGH THE DOOR,
THE DEFENDANT DID NOT SAY PAUL,
. . .