Vernon Lamar
**SATTIEWHITE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69763.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 25, 1989.

Rehearing Denied March 28, 1990.

David R. Weiner, court appointed on appeal only, San Antonio, for appellant.

Fred G. Rodriguez, Dist. Atty., Edward F. Shaughnessy, III, Bill Harris, Karen Amos, Asst. Dist. Attys., San Antonio, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code § 19.03(a)(2). After finding appellant guilty, the jury returned affirmative answers to the first two special issues under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death. Appellant raises seven points of error. We will affirm.

In order to dispose of several of appellant's points of error, a recitation of the facts disclosed at trial is necessary.[1] The indictment filed against appellant alleges in pertinent part that,

on or about the 19th day of JUNE, A.D., 1986, VERNON LAMAR SATTIEWHITE, hereinafter called defendant, did then and there intentionally cause the death of an individual, namely: SANDRA SORRELL, hereinafter called complainant, by SHOOTING THE SAID COMPLAINANT WITH A FIREARM, TO-WIT: A HANDGUN, and the said defendant did then and there intentionally cause the death of the said complainant while in the course of committing and attempting to commit the offense of KIDNAPPING upon THE SAID COMPLAINANT; ...

The record reflects that on the morning of June 19, 1986, the deceased, Sandra Sorrell, and her boyfriend, Willington Damian Mingo, Jr., were walking on Main Street in San Antonio toward American Careers, a nursing aide school in which they were both enrolled. As Mingo and Sorrell neared the school, they were approached by appellant, Sorrell's former boyfriend. Appellant said he wanted to talk to Sorrell and grabbed her by the arm, and held her in a headlock position with his arm wrapped around her neck. Appellant then displayed a .22 calibre pistol, as he took Sorrell around the building. Mingo followed appellant and Sorrell but lost sight of them when he sought help in some offices on Main Street. Mingo caught up with them again after appellant had taken Sorrell around the corner and the two were standing in a parking lot. Mingo tried to reason with the appellant to release the deceased, but appellant continued holding the deceased with his arm around her neck. Appellant then jerked Sorrell off the ground and shot her twice in the head. The deceased died as a result of the two gunshot wounds to her head.

Witnesses testified that after the shooting appellant knelt down by the deceased, tore his shirt off, and twice placed the gun to his own head before fleeing the scene in the direction of the river. Several San Antonio police officers testified concerning the apprehension of appellant. Appellant was observed standing by the river holding a gun to his head and attempting to fire the gun without success. Appellant surrendered when confronted by the officers. At his arrest and later at the police station, appellant was crying and emotionally upset.

Willington Damian Mingo, Jr., was the key witness in the State's case-in-chief. He testified that he had met Sandra Sorrell at the American Careers School, and the two had become boyfriend and girlfriend. He testified that he was in love with Sorrell and had not dated anyone else since he had begun dating her.

On the morning of the shooting, Mingo, Sorrell and their friend Gary Harris rode the city bus to the school, located at 410 S. Main at Heritage Plaza. The three were walking toward the front entrance to the school when they were approached by appellant. Appellant said he wanted to talk to Sorrell. Mingo tried to reason with the appellant, but the appellant displayed a gun. Mingo whispered to Harris to call the

---

1. We borrow liberally from the appellant's recitation of facts.

police. Appellant "grabbed the deceased by the arm and took her up under one of his arms and held her around her neck, and took her around the building." As appellant took Sorrell around the corner, Mingo unsuccessfully tried to retrieve help from some nearby law offices. He then followed appellant to a nearby parking lot, where Mingo asked the parking lot attendant to call the police.

As the confrontation continued, Sorrell was whimpering and "hollering", still held tightly within appellant's grip, with the gun held to her head. Appellant told Mingo if he [appellant] couldn't have her, "ain't nobody else gonna have her."

During this time, another man tried to come up behind appellant, but ceased the attempt when appellant told him, "[s]tay where you are or I'll shoot you, too." Appellant then jerked the deceased off the ground and shot her twice in the head. After the deceased fell to the ground, appellant raised the palm of her hand and checked for a pulse. Appellant briefly turned the gun to himself, put it down and walked away from the scene. Mingo stayed with the body until the police arrived.

Mingo explained that prior to the shooting, Sorrell had difficulties with appellant, her former roommate. Ten days prior to the shooting, appellant called Sorrell at her mother's house and told Sorrell that she owed him some money. Sorrell wanted Mingo to accompany her to the apartment that she had shared with appellant, in order to return the money. He did so and waited outside in the car. As he was waiting, a passerby caught Mingo's attention, and he looked up to see appellant with his arm around Sorrell's neck and a .12 gauge shotgun to her head. Mingo was told to leave or appellant would "blow her brains out." After leaving the area, he called the police. After waiting approximately ten minutes, he drove to Sorrell's mother's house and told her about the situation and she called the police.

Mingo recalled a second violent encounter between appellant and Sorrell, occurring approximately four to five days fol-

lowing the first incident. Mingo had accompanied Sorrell again to the apartment to retrieve some clean clothes for Sorrell and her children. As in the first incident, appellant held a shotgun to Sorrell's head with his arm around her neck and told Mingo to leave or he would "blow her brains out."

Gary Harris testified that he was a student at American Careers at the time Mingo and Sorrell attended classes there. He had ridden the bus with Mingo and the deceased the morning of the offense. As they approached the front entrance to the school, appellant confronted Sorrell and appeared "a little angry." Harris then continued into the school, but was "called back" by Mingo and told to call the police. Harris went inside and called the police.

Officers Alberto Chevera, Tommy Martin, Ralph Looney, and Felipe Santos, of the San Antonio Police Department, each testified to essentially the same facts. The officers were on duty the morning of June 19, 1986, and were called to the scene of the shooting. They observed the deceased, shot and bleeding, being held by Mingo. The officers caught up with appellant on the east bank of the river. He was standing in some bushes with the gun held to his head and they observed him pull the trigger several times. Appellant would "take the gun down, open it up, appearing to repair it or something, and put it back together and still try and to (sic) fire it some more".

Upon being confronted by the officers, appellant came out of the bushes with his hands up and was advised by the officers to lie down. Appellant complied and was handcuffed and searched. Chevera related that at this time, appellant appeared disturbed and asked, "[w]here's my baby?", repeating the question over and over. Appellant was advised of his rights and taken to the police homocide office.

At the police station, Martin passed the appellant in the hallway and noted that appellant appeared to be crying. Approximately 15 to 20 minutes after appellant's arrest, Officer Looney also saw appellant at the homicide office. Looney stated that

appellant was "emotionally upset, crying" and asked the officer "I hope she's not dead. Is she all right?"

Officer T.J. Jagge of the San Antonio Police Department testified that he is responsible for the collection and preservation of physical evidence of crime scenes. He was also called to the scene of the shooting. Jagee secured the crime scene, made diagrams and had the investigator take photographs. Jagge testified as to the location of the deceased's body based on his diagrams of the scene. He testified further as to the location on the river bank where the appellant was apprehended and the .22 calibre revolver was discovered. Two spent .22 cartridges and one live cartridge were found inside the gun.

Willard E. Miller testified that on the morning of the offense he was at work as a security guard at Heritage Plaza. His duty was to guard the parking lots and the building. His post was a guardshack located in one of the parking lots near the building. From his post that morning, Miller saw the appellant walk around the corner with the deceased in a headlock position. The girl had her hands up slightly over her head. On his way down to call the police, Miller saw the appellant shoot the deceased. He testified, "I was walking and watching him, and he was holding her, and I heard two shots, that's when I speeded up down to call the police, and I just called an ambulance while I was there. When I came back, the ambulance and the police was (sic) both there. They had the girl laying (sic) over the sidewalk next to Dwyer Street...." Miller said the gunshot was "almost point blank. It was right at her face." Immediately after the shooting, appellant pointed the gun at onlookers, "waving the gun around," as if he were trying to get the onlookers to back away from him.

Steve Tillotson, an architect, testified that he was at work in his office in Heritage Plaza on the morning of the shooting. He noticed a couple walking by his window and thought it was unusual the way they were walking. His first impression was that they were just "having some fun."

Tillotson then noticed a friend of his in the parking lot. His friend's behavior was "erratic." Tillotson knew "something must be going on for him to behave that way." He moved closer to the window to have a better view of the activity outside. Appellant had the deceased in a headlock and she appeared to be struggling. Appellant's free arm was held up high. Tillotson testified that as he watched the couple, he dialed the emergency number for the police. He related the following:

... [T]hey were still moving, he was moving with her, and he stopped for a moment, she was struggling, and then he was kind of hunched over with her, and then he raised her up, arched his back, and then there were two shots in rapid succession, I guess maybe just about a second apart.

Appellant continued his hold and carried the deceased to the corner and laid her down on the sidewalk. He knelt down for a few seconds and then stood up and looked in the direction of the people that were in the parking lot. At this point Tillotson saw the gun in appellant's hand. Appellant had it pointed directly at his own head. He lowered the gun, knelt beside the deceased, and tore his shirt off "fairly roughly." He then stood up and pointed the gun to his head again, looked around some more and walked slowly across the street, and began running through a parking lot to the other side of the river. Once the police arrived, Tillotson gave the police his name and later accompanied them to the police station.

Joe Castillo, director of the Bexar County Mediation Center, was on his way to work in the Heritage Plaza building the morning of the offense. He was parking his car in the lot next to the building when he heard people yelling. He got out of his car and looked around the corner to see what was creating the noise. He saw the deceased struggling to get away from appellant and heard her protests. Castillo stated he saw appellant exhibit the gun to the crowd and subsequently kill Sorrell. Appellant tore his clothing and at one point put the gun to his own head. Castillo and another man then followed appellant so

they could see where he was going. Shortly thereafter, the police arrived.

Richard Stengel testified he was the firearms and tool mark examiner for the Bexar County Regional Crime Lab. Through his testing, Stengel could conclusively determine whether a particular handgun fired or attempted to fire a casing. Stengel examined the weapon taken from the scene of the crime, a .22 calibre revolver, and determined that the weapon did fire the two spent cartridge cases also found at the scene. The live cartridge was struck at least 14 times by the firing pin of the weapon, but did not go off. The bullets retrieved from the body of the deceased by Dr. DiMaio, the Chief Medical Examiner for Bexar County, were also tested by Stengel. Stengel found that the bullets were fired from the .22 revolver.

Dr. DiMaio performed an autopsy on the deceased at approximately 10:00 a.m. on the morning of the offense. The autopsy included both external and internal examinations. DiMaio removed two bullets lodged in the right front region of the deceased's brain and gave them to Stengel for testing. The doctor testified the gunshot wounds were inflicted from a distance of less than two feet. In analyzing the gunshot residue on the back of both of the deceased's hands, the doctor concluded that the backs of the deceased's hands were towards the muzzle of the gun at the time the weapon was fired. In DiMaio's opinion, Sandra Sorrell died as a result of two gunshot wounds to the head. Her death was instantaneous.

John Brown, appellant's brother-in-law, testified the gun used by appellant was the same gun purchased by Brown in January of 1986. Appellant visited Brown on June 18, 1986. At some point thereafter, Brown discovered the gun was missing.

After the close of the State's case-in-chief, appellant closed without offering any evidence or testimony. The trial court overruled appellant's motion for instructed verdict. After deliberating approximately 23 hours, the jury found appellant guilty of the capital murder of Sandra Sorrell.

During the punishment phase of appellant's trial the following evidence was introduced by the State in an effort to persuade the jury to answer the special punishment issues affirmatively. At the outset, Raymond L. Frausto, a police officer for the city of San Antonio, testified he was a fingerprint classifier for the department. He stated the prints found in appellant's pen packets matched appellant's prints taken that morning. The pen packets revealed that appellant had been previously convicted of robbery, V.T.C.A. Penal Code § 29.02(a)(1), in 1983, and murder, V.T.C.A. Penal Code § 19.02, in 1976.

San Antonio police officers Harold Schott and Roger W. McGehee testified they were familiar with the character and reputation of appellant. Schott characterized appellant as a "dangerous person" and "a bad dude to mess with." McGehee's opinion was that appellant's reputation for being a peaceful and law abiding citizen was bad.

Lydia Mesquiti testified that as a social worker in the Mental Health Unit for the Medical Psychiatric Department at the Bexar County Jail, she had the occasion to observe appellant. Upon his arrival at the county jail, she found appellant to be quite hysterical, lying underneath his bunk and he was saying, "[w]here's my baby?" She was unable to get any information from appellant.

Delias L. Roach, a physician assistant at the Bexar County Jail testified he observed appellant rolling about on the floor, sobbing. Roach had noted in his records that there was a high suicide potential for appellant.

Dr. Ceasar A. Garcia, M.D., a psychiatrist who treats patients in the Bexar County Jail, evaluated appellant. Garcia had noted that appellant was tearful and had said, "I killed my wife. I don't remember." The doctor examined appellant the next day and found him much calmer. He further noted that appellant exhibited several of the criteria for an antisocial personality disorder, that is, personality problems to the point that appellant was dysfunctional. Appellant claimed to have been suffering from blackouts and hearing voices over the

previous three to four months. The doctor also stated appellant claimed previous suicide attempts.

Lilian Fields, the mother of the deceased, testified she received a letter from appellant. It was viewed by the jury. In the letter appellant told Fields how sorry he was and that he had loved Sandra Sorrell. Fields testified that she regarded the letter as an insult.

Two of appellant's sisters, Betty Jean Sattiewhite and Joyce Jackson, testified that their parents were both dead and requested the jury to spare appellant's life. Appellant's aunt, Beatrice Hedspeth, told the jury she had raised appellant and his seven brothers and sisters and also asked the jury to spare appellant.

Windell Dickerson, a psychologist, was chief mental health officer for the Texas Department of Corrections for over four years. He discussed the various factors in predicting whether an individual would commit acts of future violence. Dickerson expressed his own reservations in how punishment is assessed in capital cases in general.

After calling the above witnesses to the stand, appellant closed. The jury was instructed and heard the arguments of counsel. The panel deliberated and returned affirmative answers to both special issues submitted.

■ In appellant's first point of error, he asserts the trial court erred in overruling his motion for mistrial. The motion was based on the trial court's action in informing the jury panel of the effect of the jury's failure to agree on special issues submitted at the punishment phase of the trial.

In his general remarks to the venire panel, the trial court discussed the sentencing procedure in a capital case and the principles dealing with the special issues. In the course of this explanation, the trial court stated the following:

Now, the State of Texas, Ms. Amos, must prove each issue submitted beyond a reasonable doubt, not just a preponderance of the evidence, not just maybe, or I think so, but you must be convinced beyond any reasonable doubt in order to answer either question or both questions in the affirmative, yes. Only if all 12 believe, based upon the evidence, and they're convinced beyond a reasonable doubt that the defendant's conduct that caused the death of the deceased was committed deliberately and with a reasonable expectation that the death of the deceased would occur, if all 12 have been convinced of that beyond any reasonable doubt, the answer is yes.

If all 12 are convinced beyond any reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, if everyone is convinced of that beyond a reasonable doubt, the answer would be yes.

Now, you may not answer either question yes unless it is unanimous, and you may not answer any issue no unless 10 or more jurors agree.

In other words, to have a complete verdict, a verdict that will sustain judgment and sentence, if the answers are yes to one or two, or to both, those answers must be unanimous. If one or more of them is answered no, they can only be answered no if at least 10 of you have agreed the answer is no. *You don't need a unanimous decision to answer no like you do to answer yes. You only need 10 or more to answer no. If you have nine who conclude the answer should be answered no, and three who concluded should be answered yes, it cannot be answered. And if it cannot be answered one way or the other, either affirmatively or with 10 agreeing that it should be answered no, we have another hung jury, a mistrial. So to have a verdict that can sustain a judgment or sentence, 10 or more to answer no, or unanimous to answer yes.* Question number one may be answered no; question number two may be answered yes; question number one may be answered yes; two may be answered no; they may both be no; they may both be yes; or any combination thereof. But

to be yes, it must be unanimous; to be no, 10 or more.

Are there any questions before we proceed with the general remarks by the attorneys? Let's see if we can take them by region. Beginning one through 12. Any general questions at this point that the Court may be able to answer for you, whether it has to do with the law or a personal matter? This is number one, correct? (emphasis added)

Prospective jurors asked questions of the trial court and the court made some general remarks regarding the applicable law. Before the State made its opening remarks, the trial court retired to chambers to hear an objection from defense counsel. The appellant voiced the following objection:

> Mr. Griffin: Your Honor, comes now the defendant, Vernon Sattiewhite, in chambers and makes the following objection. The court violated the Texas Code of Criminal Procedure, Article 37.071 Section (g), where it was unable to reach a verdict as to any of the special issues in this case, that there would be a hung jury and a mistrial. We believe that informs the jury, the potential jurors, that the effect as to the effect of failure of the jury to agree on an issue submitted under this article, and respectfully ask that the Court to declare a mistrial.

The trial court overruled appellant's request for a mistrial based upon this violation.

Article 37.071(g) of the Code of Criminal Procedure provides:

> The court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the effect of failure of the jury to agree on an issue submitted under this article.

Appellant submits the trial court not only stated what the effect would be but also misinformed the jury of the effect. We will only address the specific point of error preserved by the proper objection at the trial court, that is, that the trial court informed the jury of the effect of the failure of the jurors to agree on an issue. *Williams v. State,* 622 S.W.2d 116 (Tex.Cr.

App.1981). It is readily apparent that the trial court erred by stating that a hung jury and a mistrial would result from failure to agree on any issue submitted. Art. 37.071(g), supra.

A finding that the trial court erred does not end our inquiry. We must now assess the harm, if any, which occurred from the error. Tex.R.App.P. 81(b)(2). In assessing whether harm resulted from comments made during the voir dire process, the reviewing court must view the voir dire in its entirety. *Cf. Evert v. State,* 561 S.W.2d 489 (Tex.Cr.App.1978).

A careful reading of the record does not reflect any harm to appellant. After appellant's motion for mistrial was overruled by the trial court, no further mention was made of the misstatement. Further, any misstatement to the jury was sufficiently attenuated by the trial court's charge at the punishment phase. The trial court explained:

> The burden of proof in this phase of the trial still rests upon the State and never shifts to the defendant. Each Special Issue submitted must be proved by the State beyond a reasonable doubt.
>
> In order for the jury to answer a special issue 'yes' the jurors must unanimously concur that the answer is 'yes' beyond a reasonable doubt regarding that special issue.
>
> Any juror who entertains a reasonable doubt that the answer is 'yes' as to a special issue shall vote 'no' in the jury deliberations regarding that special issue. If ten or more jurors vote 'no' in the jury deliberations as to a special issue, then the answer of the jury is 'no' regarding that special issue.
>
> *If there is any Special Issue on which the vote of the jurors is not unanimously 'yes' or not at least ten (10) in favor of an answer of 'No,' then there shall be no answer for that special Issue and the foreman should not sign his name to any answer from that Special Issue.* (emphasis added)

Moreover, we must assume that the jury conducted itself as directed by the trial court. *Marras v. State,* 741 S.W.2d 395

(Tex.Cr.App.1987). The jury did not exhibit any confusion in reaching a unanimous verdict. There was no correspondence between the jury and the trial court during the jury's deliberations at punishment. Therefore, in applying the presumption that the jury conducted itself as directed, we find that the questions were answered by a unanimous jury which was satisfied with the State's proof beyond a reasonable doubt. Accordingly, we hold that the trial court's error did not contribute to the punishment verdict beyond a reasonable doubt. Rule 81(b)(2), supra. *Mallory v. State*, 752 S.W.2d 566 (Tex.Cr.App.1988). Appellant's first point of error is overruled.

■ In his second point of error the appellant contends that the trial court erred in overruling his challenge for cause to venireman Paul Cowswert, who was shown to be disqualified as a juror due to his inability to reconsider guilt evidence in the particular context of the first special issue at the punishment phase.

The record reveals that juror Cowswert was confused as to the distinction between "deliberately" and "intentionally." The juror initially responded that the two words meant the same thing to him. However, after a lengthy questioning by the State, the defense and the trial court, the juror stated that he could follow the law.

Q. [Mr. Griffin] The bifurcated trial that you mentioned before is divided into two parts. The first part, you decide these questions of whether the intention was there, whether the defendant intentionally took the life of Sandra Sorrell, and you will be—assume with me that you have done that, and that the jury's decided that the defendant committed capital murder, did all that intentionally and caused the death and the rest of it. Then, at the guilt phase, you'd be asked to answer these questions. The first one you just read.

Do you see a difference between that question and the definition of intentional that you've got in front of you?

MS. AMOS: Your Honor, I'm going to object at this time. It puts a heavy burden on this juror because there is no legal definition for deliberately.

MR. GRIFFIN: I'm not asking him for one, Judge.

MS. AMOS: Well, he's asking if he sees a difference, and I think it's putting an undue burden on the juror to answer that question.

MR. GRIFFIN: Just that question, is there one—

THE COURT: Overruled.

A. [Juror Cowswert] I don't see much difference between intentional and deliberate. You do things, provided, I suppose, it's a voluntary act, you know. You do things deliberately, you go to get a drink of water, you go over there intentionally and deliberately to get a drink of water. Now, somebody's got a gun to your head and making you do something that's quite a bit different, but if you intentionally and deliberately do something, I mean, you've done it.

Q. All right. So that, again, if you follow along with me that you've already decided that he's—you and the other jurors—that he intentionally took the life of Sandra Sorrell, how would you answer number one?

MS. AMOS: Your Honor, I'm going to object to that. That's certainly an improper question. You can't ask someone how they're going to vote on something before they've heard evidence.

THE COURT: Sustained.

QUESTIONS BY MR. GRIFFIN:

Q. In any case, not to the particular facts of this case, but in any case where you have decided that the defendant intentionally took the life of an individual, would you believe—then would you be able then to see the difference between that, what you have just found and what you would be asked to find in question number one?

A. I don't see any difference.

Q. So—

A. It's intentionally. Deliberately to me is basically the same thing.

Q. That's what your definition is?

A. Yes.

Q. Logically, you would have to automatically answer number one yes?

A. Yes.

MR. GRIFFIN: Your Honor, we'd object, then, or ask the juror be excused for that reason that he would automatically find the answer to question number one to be affirmative without any evidence or any testimony to the contrary. As a force of his logic, he would have, by the definitions that he holds as an individual, have to answer that question yes.

THE COURT: What says the State?

MS. AMOS: May I inquire?

THE COURT: Sure.

QUESTIONS BY MS. AMOS:

\* \* \* \* \* \*

Q. I also talked about pre-meditation which would be way up here. Premeditation. And then intentional here, and somewhere in-between there is—

Q. —deliberate.

A. Well, that's your definition.

Q. I'm not giving you a definition.

A. Well, let's say that's how you interpret or how you look at it.

Q. Do you agree with me that there's a reason why the legislature would put that there?

A. I'm sure there is a reason. I mean, the law is very complicated.

MR. GRIFFIN: That's a logic that I don't think can be sustained by any reasonable person that our legislature would have a reason or rationale for doing that, and I object to that.

THE COURT: Overruled. Proceed.

QUESTIONS BY MS. AMOS:

Q. And because it's there, a juror cannot automatically answer that question just because of what happened in the guilt/innocence phase of the trial. He must consider again and look again, and then and only then answer that question.

A. Well, to me they overlap so much.

Q. They do overlap. It's a very, very fine distinction.

A. *Well, you know, the evidence depends on what's presented in court, if you can make that distinction, you know, if it was there, I suppose I could*

*do that, but you're walking a pretty fine line.*

Q. It is a very, very fine line. That's obviously why we have difficulty with it, but it's there for a reason, and it's there to consider again, and it's there to only consider during the punishment phase of the trial. It is apart, it is separate from what was found in the guilt/innocence part of the trial, as far as intentional act.

Now you must go a little bit further and pick up a deliberate act, to act purposeful, with thought.

Can you tell us that you would not automatically answer this question yes or no until the end of the trial when the questions would be given to you?

MR. GRIFFIN: That's argumentative, Judge. The venireman's already answered that question yes.

THE COURT: Overruled.

QUESTIONS BY MS. AMOS:

Q. Can you follow the instructions of the law?

A. *Yes, and I could wait until the trial is over, you know, to make a decision.*

THE COURT: Let me see what you have there?

QUESTIONS BY MS. AMOS:

A. *Yes.*

Q. And then deliberate?

A. I've done it before, I guess I could do it again.

Q. And then deliberate and then and only then be able to answer these questions.

A. *Yes. I mean, I'm not going to make any predetermined decision until I hear all the facts and evidence.*

MS. AMOS: Thank you.

[Emphasis added]

In analyzing whether the trial court properly denied a challenge for cause, we are faced with a cold record; therefore we give deference to the trial judge who was in the position to more accurately gauge the venireman's demeanor. *Holland v. State,* 761 S.W.2d 307 (Tex.Cr.App.1988); *Livingston v. State,* 739 S.W.2d 311 (Tex. Cr.App.1987); *Franklin v. State,* 693

S.W.2d 420 (Tex.Cr.App.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986); *Bird v. State*, 692 S.W.2d 65 (Tex.Cr.App.1985), *cert. denied*, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). This rule is especially true when we are faced with seemingly equivocating responses. *Holland*, supra, at 318.

It is readily apparent from the record that the juror was confused and equivocating in his responses. However, appellant is equating confusion and equivocation with an inablility to follow the law. Appellant cites *Gardner v. State*, 730 S.W.2d 675 (Tex.Cr.App.1987) *cert. denied*, 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1988) as authority. This case is instructive in that it shows the difficulty jurors have in understanding the difference between "deliberate" and "intentional." However, the *Gardner* Court points out that a juror who fails to understand the difference between the two terms may be subject to a challenge for cause *absent rehabilitation or clarification of the responses. Id.* at 689.

It is not error on the part of the trial court to deny a challenge for cause to a venireman who gives equivocal answers on whether or not he could answer a punishment issue in the negative. *Phillips v. State*, 701 S.W.2d 875 (Tex.Cr.App.1985), *cert. denied*, 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986). In the instant case, Cowswert stated he was fully capable of following the law and fairly and impartially answering the punishment issues. Therefore, we hold the trial court did not err in overruling the challenge for cause. *Rougeau v. State*, 738 S.W.2d 651 (Tex.Cr.App. 1987), *cert. denied*, 485 U.S. 1029, 107 S.Ct. 1586, 99 L.Ed.2d 901 (1988): *McCoy v. State*, 713 S.W.2d 940 (Tex.Cr.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). *Compare Livingston*, supra. (Prospective jurors properly excused where their views on capital punishment would prevent or substantially impair the performance of their duties as jurors and in accordance with their instructions and oath). Appellant's second point of error is overruled.

In his third point of error the appellant asserts the trial court erred in overruling his challenge for cause of venireperson Barbara Lamm who was improperly informed by the State that appellant would not necessarily die even if the death penalty were assessed.

During the voir dire proceedings, the following exchange took place:

Q. [By defense counsel] Should you decide that the defendant is guilty of capital murder, the only thing you can decide is whether he gets life or death. Those are the only two issues, having found him guilty of capital murder, or any defendant, then you get to answer these questions, and then only would the issue of life and death arise. You can't give him a number of years, you either answer yes, yes. If you do that, he dies.

MR. HARRIS [prosecutor]: Excuse me. *He doesn't die. He may be assessed the death penalty. It may be 20 years. He may never die.* I think that's an inaccurate statement that he not necessarily die. He may be assessed the death penalty, that's true.

MR. GRIFFIN: See, that's an inappropriate statement, Judge.

MR. HARRIS: I think his statement is inappropriate, too.

MR. GRIFFIN: I think it may prejudice this juror to lessen the terrible burden that she would have to shoulder in answering those questions, that if she believes that she can answer those questions yes and yes, and the defendant would not die, or be 20 years until he dies, then this juror may have been damaged, as far as we're concerned, as a potential juror. We ask for that reason, because of the conduct of the Counsel for the State, that this witness be excused with regret.

THE COURT: One, I think they ought to be informed that the penalty of death, Counsel—

MR. GRIFFIN: Yes, sir. I'm sorry.

THE COURT: I think that they ought to be informed the penalty of death will

be imposed. The penalty of death will be imposed.

QUESTIONS BY MR. GRIFFIN:

Q. I agree.

A. [The Court] That's exactly what will happen if those two questions are answered yes.

MR. GRIFFIN: Then I'd like the juror instructed on it.

THE COURT: I just have—

MR. GRIFFIN: Okay. Despite the instruction of the Court, we feel that the venirewoman has been damaged and prejudiced in assessing an answer of yes, yes to those two questions because of the conduct at stake and because of her being informed, however erroneously that the defendant may never die, even if she answered those questions, we ask that she be excused for cause, Your Honor.

THE COURT: That'll be denied. [Emphasis added]

Appellant also re-urged his challenge under the Eighth Amendment to the United States Constitution. This challenge was also denied.

Appellant presents us with the contention that *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) controls this point of error. The United States Supreme Court held in that case that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. *Id.* at 329, 105 S.Ct. at 2639–40. In *Caldwell,* supra, the prosecutor urged the jury not to view itself as determining whether the defendant would die, because the case would be reviewed by the state supreme court. The Supreme Court noted that such an argument minimized the sentencing jury's sense of responsibility for determining the appropriateness of death, in contravention of the Eighth Amendment's heightened standard of reliability in the determination that death is the appropriate punishment in a specific case. *Id.* at 343, 105 S.Ct. at 2647. Appellant concedes that the holding in the *Caldwell* case was specifically limited to

jury argument. However, appellant urges us to apply the *Caldwell* rationale to a situation arising during individual voir dire during jury selection.

We have applied the rationale of the *Caldwell* case recently in *Modden v. State,* 721 S.W.2d 859 (Tex.Cr.App.1986), *cert. denied* 485 U.S. 1040, 108 S.Ct. 1603, 99 L.Ed.2d 917 (1988) regarding error in jury argument. We decline the opportunity to apply the holdings of *Caldwell* and *Modden,* both supra, to voir dire remarks.

Moreover, the appellant has failed to specify on appeal what ground for a challenge for cause required Ms. Lamm to be excused. *See* Art. 35.16(a)(c), V.A.C.C.P. It appears the impetus of appellant's argument is that the prosecutor's comments so tainted the prospective juror she would be biased. In reviewing an issue regarding bias in a juror, the question to be considered is whether the juror was fully capable of following the law and fairly and impartially answering the punishment issues. *See: Rougeau* and *McCoy,* both supra. Challenges for cause should be granted when the answers given by the venireperson indicate that he or she is incapable or unfit to serve on the jury. *McCoy,* supra. In the instant case, venireperson Lamm was instructed by the trial court that the death penalty would be imposed. Further, the voir dire by Mr. Griffin reveals that venireperson Lamm stated she could follow the law. As explained *ante,* we give deference to the trial judge since he was in the position to more accurately gauge the venireperson's demeanor. *Holland,* and *Livingston,* both supra. Therefore, we hold the trial court did not err in overruling appellant's challenge for cause. Appellant's third point of error is overruled.

■ Appellant asserts in his fourth point of error that the trial court erred in overruling his objection to the admission of extraneous offenses or misconduct committed by appellant against the deceased. Appellant complains of testimony elicited from Damian Willington Mingo during the guilt/innocence phase concerning previous

violent encounters between the deceased and apellant.

As discussed *ante,* Mingo testified that approximately ten days prior to the fatal shooting, he accompanied the deceased to her apartment so she could return some money to appellant. Upon arriving at the apartment, the deceased went upstairs while Mingo waited in the car. After approximately forty-five minutes, appellant appeared in the window. A passerby stopped to get Mingo's attention so that he would look up. When Mingo looked up to the window, he saw appellant with his arm around the deceased's neck and a shotgun to her head. Appellant told Mingo that unless Mingo left, appellant would "blow her brains out." Mingo left immediately and went to call the police.

A related incident was also recalled by Mingo. Two or three days after the above described incident, Mingo and the deceased again returned to the apartment in order to retrieve some clothing for the deceased and her children. Again appellant held a shotgun to the deceased's head with his arm around her neck and told Mingo to leave or he would "blow her brains out."

Appellant asserts that admission of this objected-to testimony violates rule 404, Tex.Rules Crim.Evid.[2] and does not fall within the scope of V.T.C.A., Penal Code § 19.06.[3]

We note at the outset that this evidence was initially heard outside the presence of the jury and the trial court sustained appellant's specific objection. Later, the testimony was again introduced before the jury. It is apparent that at this point in the trial the trial court, the State, and the defense were all aware of the content of Mingo's testimony even though no prejudicial testimony had been elicited at the time of the second objection. The second objection was overruled and appellant was granted a "running objection" to the admitted testimony concerning the extraneous acts of misconduct.

In order to complain at the appellate level that the trial court erred in admitting certain testimony, the accused must lodge a timely objection to the testimony. *Thompson v. State,* 691 S.W.2d 627 (Tex. Cr.App.1987), *cert. denied* 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985); *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App. 1976), *cert. denied* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); Rule 52(a) Tex.R.App.P. The purpose of lodging a timely and specific objection is to inform the trial court of the basis of the objection and to give the court an opportunity to rule on the specific objection as the evidence is introduced. See *Goodman v. State,* 701 S.W.2d 850 (Tex.Cr.App.1985).[4]

---

**2.** Rule 404 Tex.Rules Crim.Evid. provides:
   (a) Character evidence generally. Evidence of a person's character or trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
   (1) Character of accused. Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same; ...
   (b) Other crimes, wrongs or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief such evidence other than that arising in the same transaction.

**3.** V.T.C.A., Penal Code § 19.06 provides:

In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.
V.T.C.A. Penal Code § 19.06 is fully applicable to Capital Murder prosecutions. *Lamb v. State,* 680 S.W.2d 11 (Tex.Cr.App.1984).

**4.** In *Goodman* the defendant made a running objection to all questions concerning the offense, the nature of the offense, and everything related to the offense, and this objection was made during the State's cross-examination of a witness, Dr. Stafford. On appeal, appellant complained that another witness, Dr. Hunter, was allowed to testify concerning the above matters. Six witnesses testified between Dr. Stafford and Dr. Hunter. Appellant never objected after his initial "running objection" was

The objection in the instant case was not in the best form. However, the initial objection was sustained, which is sufficient to preserve error. It is possible to glean the foundation of appellant's second objection by looking at both objections together. Therefore, we will now consider the merits of appellant's point of error.

Appellant asserts that the admitted extraneous offenses are violative of Rule 404, supra, and are also not admissible under § 19.06, supra. We disagree.

This Court has developed a two-prong test in determining the admissibility of an extraneous offense. First, it must be determined that the extraneous offense evidence is relevant to a material issue in the case other than the defendant's character. Second, the evidence must possess probative value which outweighs its inflammatory or prejudicial effect. *Robinson v. State*, 701 S.W.2d 895 (Tex.Cr.App.1985); *Plante v. State*, 692 S.W.2d 487 (Tex.Cr.App.1985); *Williams v. State*, 662 S.W.2d 344 (Tex.Cr.App.1983).

As to the first prong of the test, the elicited evidence in the instant case reflects appellant and the deceased had a tumultuous relationship in which appellant terrorized and threatened the deceased, finally carrying out his threat to kill her. The objected-to evidence is illustrative of material issues in this case. This Court has previously held evidence which reflects on the issue of the intent of the accused is admissible. *See Morgan v. State*, 692 S.W.2d 877 (Tex.Cr.App.1985). Appellant argued at trial and before this Court that the offense committed was voluntary manslaughter. Thus, the evidence was necessary to refute that appellant was acting under sudden passion.

In *Hall v. State*, 640 S.W.2d 307 (Tex.Cr.App.1982), the facts were very similar to the instant case. There, we held admissible evidence of the defendant having called the victim on the telephone, threatening her life, and the defendant and the victim having an altercation in a department store prior to the offense. Here, similar evidence regarding appellant's prior threats against the deceased and altercations between the two individuals was properly admitted to show relevant facts and circumstances surrounding the killing, the relationship existing between appellant and his victim and to show the condition of the appellant's mind at the time of the offense. V.T.C.A., Penal Code § 19.06.

Accordingly, we hold that the admitted evidence reflects on material issues other

made during Dr. Stafford's testimony. We found no support in the case law for a proposition that a running objection on a particular matter would preserve error *whenever that matter was brought up again in the trial,* and regardless of what witness brought it up or what time it was brought up. We stated that such a doctrine, in fact, would conflict with preservation of error doctrines that stand for the proposition that "error in admission of evidence is cured when the same evidence comes in elsewhere without objection, and that the defendant must object every time the alleged inadmissible evidence is offered (citations omitted)".

Under the Rules of Appellate Procedure, adopted since *Goodman,* Rule 52(a) states quite clearly that,

In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling he desired the court to make if the specific grounds were not apparent from the context.

In promulgating these rules, we took no "pot shots" at running objections because in certain situations they have a legitimate function. A running objection, in some instances, will actually promote the orderly progression of the trial. When an attorney has an objection to a line of testimony from a witness, it is often disruptive for the trial judge to force him to make the same objection after each question of opposing counsel just so that the attorney can receive the same ruling from the trial judge to preserve error. As long as Rule 52 is satisfied, that is, as long as the running objection constituted a timely objection, stating the specific grounds for the ruling, the movement desired the court to make (if the specific grounds were not apparent from the context of the running objection) then the error should be deemed preserved by an appellate court.

What *Goodman* stands for is the proposition that an advocate who lodges a running objection should take pains to make sure it does not encompass too broad a reach of subject matter over too broad a time or over different witnesses. Rule 52(a) must be complied with. But there are situations where a running objection, made with the express permission of the trial judge, not only does so, but does so much more appropriately than a redundant and disruptive (to the orderly flow of trial) series of individual objections.

than appellant's character. *Robinson,* supra.

Second, we must determine whether the probative value outweighed the prejudicial effect of the evidence. *Robinson* and *Plante,* both supra. The factors used to measure the probative value of extraneous offenses include the similarity between the prior act and the offense charged, the closeness in time of the extraneous transaction to the charged offense, and the availability of alternative sources of proof. *Robinson,* supra, at 898.

In the instant case, appellant's prior conduct of threatening the deceased while holding a gun to her head occurred twice prior to the shooting. The events occurred within a few days of the shooting and reflect an ongoing course of violent conduct not caused by any provocation on the part of the deceased. Since the victim is dead, Mingo is the witness closest to the actual events who could most accurately recall the relationship between appellant and the deceased. Without this evidence regarding appellant's prior conduct toward the deceased, the jury would have been left with a void regarding the prior relationship. Accordingly, these factors support the overwhelming probative value of the admitted evidence.

Prejudice is inherent in the use of extraneous offenses. This prejudice can be lessened by introducing the evidence as a transaction rather than as a criminal offense. Mingo's testimony did not suggest that appellant had faced civil or criminal liability for the extraneous offenses, it merely related factual information regarding the relationship. Moreover, appellant never requested an instruction limiting the jury's use of the evidence. Though some prejudice to appellant is apparent, the overwhelming probative value greatly outweighs any prejudicial effect. We hold that the extraneous acts were properly admitted. *Robinson,* supra. Appellant's fourth point of error is overruled.

■ Appellant contends in his fifth point of error that the trial court's charge to the jury was fundamentally defective due to the failure to place upon the prosecution the burden of proving the absence of sudden passion in the paragraph of the charge applying the law of capital murder to the facts of the case. The trial court charged the jury in the following manner:

### V.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 19th day of June, A.D., 1986, in Bexar County, Texas, the defendant, Vernon Lamar Sattiewhite, did intentionally cause the death of an individual, namely: Sandra Sorrell, by shooting the said Sandra Sorrell with a firearm, to-wit; a handgun and the said defendant did intentionally cause the death of the said Sandra Sorrell while in the course of committing and attempting to commit the offense of kidnapping upon the said Sandra Sorrell, then you will find the defendant guilty of capital murder as charged in the indictment.

Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you will find the defendant not guilty of capital murder, and next consider whether the defendant is guilty of murder.

### VI.

Now if you find from the evidence beyond a reasonable doubt that on or about the 19th day of June, A.D., 1986, in Bexar County, Texas, the defendant, Vernon Lamar Sattiewhite, did intentionally cause the death of an individual, namely; Sandra Sorrell, by shooting the said Sandra Sorrell with a firearm, to-wit: a handgun, and that the defendant, in so acting, was not acting under the immediate influence of sudden passion arising from an adequate cause, then you will find the defendant guilty of murder.

If you do not so believe, or if you have a reasonable doubt thereof, you will find the defendant not guilty of murder and you will next consider whether the defendant is guilty of voluntary manslaughter.

## VII.

If you find from the evidence beyond a reasonable doubt that on or about the 19th day of June, A.D., 1986 in Bexar County, Texas, the defendant, Vernon Lamar Sattiewhite, did intentionally cause the death of an individual, namely: Sandra Sorrell, by shooting the said Sandra Sorrell with a firearm, to-wit; a handgun, but that the defendant, Vernon Lamar Sattiewhite, in so doing, was acting under the immediate influence of sudden passion arising from an adequate cause, or if you have a reasonable doubt as to whether defendant, if he did so act, did so under the immediate adequate cause, then you will find the defendant guilty of voluntary manslaughter.

If you do not so believe or if you have a reasonable doubt thereof, you will acquit the defendant of voluntary manslaughter.

Although appellant did not object to this portion of the charge at trial, he now asserts the charge caused him egregious harm by failing to apply the law of sudden passion to the *capital murder* portion of the charge. This is a question of first impression before the Court. The issue of applying the law of sudden passion to the *murder* portion of the charge was decided in *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Cr.App.1983). There we held that in a murder case, where the lesser included offense of voluntary manslaughter is included in the court's charge, the prosecution's burden of proving the lack of sudden passion must be placed in the paragraph of the charge applying the law of murder to the facts of the case. *Id.* at 751. *See also Bradley v. State*, 688 S.W.2d 847 (Tex.Cr.App.1985).

We stated in *Cobarrubio*, supra, that the deletion of the issue of sudden passion from the murder paragraph results in "a decided likelihood that a jury would affirmatively answer the murder paragraph never having considered the defensive issue of sudden passion." *Id.* at 752. The effect of such an incomplete instruction is to significantly diminish the state's burden of proof. *Id.* In *Lawrence v. State*, 700 S.W.2d 208

(Tex.Cr.App.1985) we overruled *Cobarrubio*, supra, to the extent it held that the failure of the trial court to charge in accordance with *Cobarrubio*, supra, constituted fundamental error. Instead, "Cobarrubio error" must be reviewed in light of the holding in *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985). In *Almanza*, supra, this Court abandoned the concept of fundamental error in the jury charge and instead adopted a two-part test to be used in examining allegations of a jury charge error. The first step is to determine if the charge contains error. Secondly, if there is an objection to the error, then reversal is mandated only if the record reveals the error caused some actual harm. Where no objection is made, the burden is on appellant to show actual egregious harm. *Id.* *See also Lawrence*, supra, at 212.

In order to ascertain whether the accused has been harmed, the reviewing court must examine the trial in light of the charge, the state of the evidence, the contested issues, the arguments of counsel, and any other relevant information contained in the record. *Almanza*, supra, at 171. Accordingly, if the trial court's charge on voluntary manslaughter was erroneously submitted due to absence of evidence to raise the issue of "sudden passion arising from adequate cause," then there would be no egregious harm to the defendant in failing to comply with *Cobarrubio*, supra. *Smith v. State*, 721 S.W.2d 844 (Tex.Cr.App.1986).

The State urges that such a situation arose in the instant case because the trial court erred in submitting the lesser included offense of voluntary manslaughter. We agree.

The standard for determining whether the trial court erred in failing to submit a jury charge on a lesser included offense is the two step analysis prescribed in *Royster v. State*, 622 S.W.2d 442 (Tex.Cr.App.1981). First, the lesser offense must be included within the proof necessary to establish the offense charged. Second, there must be some evidence in the record that if the

defendant is guilty, he is guilty only of the lesser offense.

Voluntary manslaughter is established when it is shown that the murder was committed under § 19.02, supra, except that the death was caused under the immediate influence of sudden passion arising from an adequate cause. V.T.C.A., Penal Code § 19.04(b); *Braudrick v. State*, 572 S.W.2d 709 (Tex.Cr.App.1978) *cert. denied* 440 U.S. 923 99 S.Ct. 1252, 59 L.Ed.2d 477. Sudden passion is defined in § 19.04(b), supra, of the Penal Code as follows:

'Sudden Passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

The Penal Code also provides a definition of what cause is an adequate cause. Subsection (c) of 19.04 provides:

'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

Since voluntary manslaughter is a death caused under the immediate influence of sudden passion arising from adequate cause, voluntary manslaughter is a lesser included offense of murder. *See Brooks v. State*, 548 S.W.2d 680 (Tex.Cr.App.1977). Therefore, appellant has satisfied the first prong of *Royster*.

We must next determine whether there is evidence in the record to support that if appellant is guilty, he is guilty only of the lesser included offense. A charge on voluntary manslaughter should only be given when there is evidence that the defendant acted under the "immediate influence of sudden passion arising from adequate cause." *Marquez v. State*, 725 S.W.2d 217 (Tex.Cr.App.1987); *see also Ojeda v. State*, 712 S.W.2d 742 (Tex.Cr.App.1986); *Hobson v. State*, 644 S.W.2d 473 (Tex.Cr.App.1983); *Cerda v. State*, 557 S.W.2d 954 (Tex.Cr. App.1977). Appellant argues that the evidence which supports the admission of the voluntary manslaughter charge consists of the following:

(1) Appellant stated to the new lover, Mingo, at the time of the confrontation that 'If he [appellant] can't have her [the deceased], ain't nobody else gonna have her'.

(2) Appellant tried to turn the gun on himself after shooting the deceased.

(3) Appellant was crying and emotionally upset at the scene of the offense and at the police station, and showed concern for the deceased by repeatedly asking 'where's my baby?' and 'I hope she's not dead. Is she all right?'.

In the determination whether the evidence was sufficient to warrant a jury charge on voluntary manslaughter, this Court must consider all relevant facts and circumstances. It is not enough that appellant acted mad or upset, the evidence must also show that the anger was the result of an act of provocation on the part of the deceased or a third party acting in concert with the deceased. *Marquez*, supra at 224; *See Lincecum v. State*, 736 S.W.2d 673 (Tex.Cr.App.1987) *cert. denied* 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 936 (1988). In cases where this Court has held the evidence was sufficient to warrant such a charge, a distinguishing factor tends to be that the deceased and the appellant had engaged in some sort of altercation or argument which immediately escalated into a killing. *See Humphries v. State*, 615 S.W.2d 737 (Tex.Cr.App.1981) (stabbing in the course of a heated argument); *Schoelman v. State*, 644 S.W.2d 727 (Tex.Cr.App. 1983) (shooting after an argument over a ring). However, this Court has distinguished cases where the passion was not sudden. *Hobson*, supra. (Charge on voluntary manslaughter not warranted where altercation took place in the morning and the stabbing took place in the evening.) *Jenkins v. State*, 740 S.W.2d 435 (Tex.Cr. App.1983). (Killing resulted after highway chase and altercation; defendant not entitled to a charge on voluntary manslaughter because fear alone is not enough to raise sudden passion.) Even if the evidence supports such a charge, if unobjected to, appel-

lant must show egregious harm. *Lawrence, supra.* (Egregious harm not shown where lovers quarrel at bar escalated upon returning to the apartment defendant and deceased shared.) *Compare, Castillo-Fuentes v. State,* 707 S.W.2d 559 (Tex.Cr. App.1986). (Egregious harm shown where parent's argument over surname of child, escalated from threat on husband's life to husband shooting wife and voluntary manslaughter was only theory proffered by the defense.)

Appellant equates a showing of extreme remorse after the killing with evidence showing he was acting under sudden passion when he committed the act. We disagree. The evidence submitted by appellant does support that he, the deceased and Mingo were involved in a lovers' triangle some time prior to the offense. The evidence also shows appellant regretted her death immediately after the shooting. There is nothing to indicate appellant's passion arose at the time of the offense. At best, the evidence suggests appellant's anger arose a number of days prior to the shooting as evidenced by his life threatening acts against the deceased on at least two other occasions. This evidence does not indicate in any way that appellant committed the instant offense under the immediate influence of sudden passion arising from adequate cause. Prior provocation or anger alone is not sufficient to raise the issue of voluntary manslaughter. *Smith, supra.*

Appellant further submits that the encounter between Mingo, appellant and the deceased at the bus stop on the morning of the offense was a *provocation.* We disagree. There is no testimony to indicate that the appellant became enraged, resentful or terrified immediately prior to the shooting. *Gonzales v. State,* 717 S.W.2d 355 (Tex.Cr.App.1986). In order to raise the issue of provocation, it is necessary that there be evidence of the deceased's conduct just prior to her death; also the evidence must be sufficient to be considered provocation. *Hernandez v. State,* 643 S.W.2d 397 (Tex.Cr.App.1982). In the instant case, there is no evidence of provocation by the deceased or another acting with the deceased. The record is devoid of evidence pertaining to why appellant was present at the bus stop on that particular morning. The record reflects appellant had confronted and accosted the deceased and her new boyfriend repeatedly prior to the day of the shooting. The evidence shows that Sandra Sorrell and her new boyfriend, Mingo, were merely on their way to school from the bus stop. There is no evidence of any act of provocation on the part of the deceased or Mingo. To the contrary, the evidence adduced at trial reflects that the two went out of their way to avoid conflict or violent confrontation with appellant.

In the instant case, the evidence does not support a finding that if appellant is guilty, he is guilty only of the lesser included offense of voluntary manslaughter. To the contrary the evidence did not raise the issue of voluntary manslaughter and therefore the court's submission of the charge was erroneous. *Royster, supra.* Therefore, it is unnecessary to undertake a harm analysis under the second step of *Almanza, supra,* since we have found that appellant was not entitled to the charge. *Smith, supra.*

■ Even assuming the evidence did raise the issue of voluntary manslaughter, whether this instruction must appear in the Capital Murder application paragraph, as well as the murder application paragraph, is a question of first impression for this Court. In speaking to the issue in the context of a murder case, the *Cobarrubio* court explained:

With the defensive issue of sudden passion deleted from the paragraph on murder and placed only in the voluntary manslaughter paragraph as it is here, there exists a decided likelihood that a jury would affirmatively answer the murder paragraph, never having considered the defensive issue of sudden passion which would reduce the offense of murder to the lesser included offense of voluntary manslaughter.

*Id.* at 752.

Such is not the case in a capital murder situation. The jury could not convict appel-

lant of capital murder without necessarily considering first whether the appellant is guilty of murder. The jury must look first to the murder paragraph since capital murder is essentially "Murder Plus" another offense. In the instant case, the capital feature was a murder in the course of kidnapping. Section 19.03 of the Texas Penal Code provides:

> (a) A person commits an offense if he commits murder as defined under *Section 19.02(a)(1)* of this code and:
>
> (2) the person intentionally commits the murder in the course of committing or attempting to commit *kidnapping,* burglary, robbery, aggravated sexual assault, or arson;
>
> \*　\*　\*　\*　\*　\*
>
> (c) If the jury does not find beyond a reasonable doubt that the defendant is guilty of an offense under this section, he may be convicted of murder or of any lesser included offense. (emphasis added)

A jury must first find the appellant committed murder under Sec. 19.02(a)(1) before the jury may convict of capital murder. Thus, the jury must look to the capital murder application paragraph in conjunction with the murder paragraph. It is axiomatic that this Court will consider the charge as a whole rather than a series of isolated statements. *Selvage v. State,* 680 S.W.2d 17 (Tex.Cr.App.1984) *cert. denied* 485 U.S. 983, 108 S.Ct. 1283, 99 L.Ed.2d 494 (1988); *Jackson v. State,* 591 S.W.2d 820 (Tex.Cr.App.1980). We hold that where the evidence supports submission of the issue of voluntary manslaughter and the burden is placed on the prosecution in the *murder* application paragraph, the safeguards prescribed in *Cobarrubio,* supra, have been met. It is not necessary to restate the instruction in the capital mur-

der application paragraph. Appellant's fifth point of error is overruled.

■ Appellant in his sixth point of error complains that Art. 37.071(b), V.A.C.C.P.,[5] is unconstitutional in that it denies him the right to a fair and impartial jury, effective assistance of counsel, equal protection of law, due process and due course of law, and his right to be free from cruel and unusual punishment guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Art. I. §§ 10, 13, and 19 of The Texas Constitution. Specifically, appellant contends said statute fails to properly narrow the class of individuals eligible for the death penalty.

The gist of appellant's argument is that special issue number one is a meaningless question because it is one which the jury will automatically answer affirmatively at the punishment stage of trial since a finding of intentional conduct has been made at the guilt/innocence stage. That is, appellant argues "common sense teaches that there is no difference between 'intentional' and 'deliberate'"; thus, "there is no real distinction between 'intentional' and 'deliberate' despite this Court's repeated pronouncement that there is". We disagree.

This argument has been repeatedly reviewed and rejected. *Marquez,* supra; *Russell v. State,* 665 S.W.2d 771 (Tex.Cr.App.1983) reh. den. 466 U.S. 932, 104 S.Ct. 1720, 80 L.Ed.2d 192 (1984). Most recently in *Tucker v. State,* 771 S.W.2d 523, (Tex.Cr.App.1988) this Court expressly upheld the constitutionality of special issue one. Judge Clinton, writing for the majority, explained:

> As for appellant's final claim, we have previously held that 'deliberate' and 'intentional' have different meanings for the purposes of our capital sentencing

---

5. Art. 37.071(b) provides:

(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

scheme. In *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981), we opined that *if 'deliberately and intentionally and knowingly were linguistic equivalents, ... Art. 37.071(b)(1) ... would be a useless thing in that a finding of an intentional or knowing murder would be irreconcilable with a finding that the defendant's conduct was not committed deliberately. We will presume that the Legislature would not have enacted Art. 37.071(b)(1) ... had it intended for a finding of deliberateness to be based upon the same standard as that of intentional or knowing.'*

*Id.* at 552–53. [emphasis added]

Thus, this Court has rejected appellant's argument that special issue one is unconstitutional because it fails to sufficiently narrow the class of death eligible murderers. *See Fearance v. State*, 771 S.W.2d 486 (Tex.Cr.App.1988); *See also Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), reh. den. 464 U.S. 874, 104 S.Ct. 209, 78 L.Ed.2d 185. *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (reh. den. 485 U.S. 944, 108 S.Ct. 1126, 99 L.Ed.2d 286). Appellant's sixth point of error is overruled.

■ In his seventh point of error, appellant complains the trial court erred at the punishment phase in not permitting a defense expert witness to testify to his opinion that appellant should receive a life sentence. Appellant called Windell Dickerson, a psychologist, to provide testimony to assist the jury in answering the second special issue submitted under Art. 37.071(b) of the Code of Criminal Procedure. Dickerson testified he was a psychologist and had formerly served as Chief Mental Health Officer for the Texas Department of Corrections for a period of four years. He further testifed regarding studies which indicate psychologists are only able to successfully predict future dangerousness 33% of the time. Dickerson discussed several factors affecting the difficulty of predicting the potential for future dangerousness including: (1) violence is an unusual statistical phenomena, (2) an individual's poten-

tial for violent propensities vary over time, (3) an individual's potential for violent behavior decreases with age, and (4) the essence of human behavior is unpredictability.

The defense then attempted to elicit a response from Dickerson as to which punishment would be most appropriate for appellant; the death penalty, or mandatory life imprisonment. The State's objection was sustained by the trial judge and appellant's counsel perfected his bill of exception.

According to appellant, the trial court's refusal to permit Dickerson to testify that in his opinion the appellant should receive a life sentence resulted in a violation of Rule 702, Tex.R.Crim.Evid. This Rule provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Id.*

This Court has placed limitations on expert testimony. We have held that experts may testify at the punishment stage as to the defendant's propensity to commit violence in the future. *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976) *cert. denied* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr.App.1977); *see also Barefoot v. Estelle*, supra. The argument that a witness may recommend a particular punishment to the trier of fact has been soundly rejected. We have concluded that such testimony would escalate into a "battle of the experts." *Schulz v. State*, 446 S.W.2d 872 (Tex.Cr.App.1969) [Psychiatrist was not permitted to testify regarding the effect of placing defendant on probation rather than sentencing him to imprisonment]. *See also Logan v. State*, 455 S.W.2d 267 (Tex.Cr.App.1970) [Probation officer not permitted to testify regarding requirements of application for probation and as to probation program]; *Asay v. State*, 456 S.W.2d 903 (Tex.Cr.App.1970) [Law enforcement officer's testimony that short term of imprison-

ment would be more likely to affect reform of defendant than would long term properly excluded].

Before an expert witness can offer opinion testimony the following three criteria must be shown:

    1. the witness must be competent and qualified to testify;

    2. the subject must be one upon which the aid of an expert's opinion will be of assistance to the jury;

    3. his testimony may not state a legal conclusion.

*Chambers v. State*, 568 S.W.2d 313 (Tex. Cr.App.1978); *cert. denied* 474 U.S. 864, 106 S.Ct. 181, 88 L.Ed.2d 150 (1985).

In the instant case, Dickerson's excluded testimony does not meet the first two criteria. Appellant has not set out any evidence which would show Dickerson qualified to recommend punishment to the trier of fact. He was qualified to testify as to appellant's future dangerousness, and said testimony was properly admitted. Moreover, the subject matter of what punishment should be assessed was not one upon which the aid of his opinion would have been of assistance to the trier of fact. Rather, such testimony would only tend to confuse the jury. In *Schulz*, supra, this Court stated:

    ... If such testimony is allowed, the State would be justified in seeking to put on an expert, perhaps a sociologist or penalogist to prove that it would be better for the defendant to serve time in a penal institution. Then further testimony would no doubt be offered by both sides on the relative values of probation compared to confinement.

*Id.* at 874.

We hold that Dickerson's testimony as to which punishment, the death penalty or life imprisonment, should be assessed, was properly excluded.

Appellant's conviction is affirmed.

CAMPBELL, J., concurs in the result.

TEAGUE, J., dissents.

CLINTON, Judge, dissenting.

I dissent to the majority's conclusion, in treating appellant's second point of error, that the trial court did not err in failing to grant appellant's challenge for cause against venireman Cowswert. Clearly Cowswert agreed a finding of guilty of "intentional" murder at the guilt/innocence phase of trial "logically" would lead him to answer Article 37.071(b)(1), V.A.C.C.P., inquiring whether appellant acted "deliberately," "automatically" in the affirmative. Thus, as the majority notes, it was up to the State to rehabilitate Cowswert, for he had manifested an inability to reconsider guilt evidence in the particular context of the first special issue, rendering him subject to challenge for cause. *Gardner v. State*, 730 S.W.2d 675, at 681 (Tex.Cr.App. 1987). However, I do not believe Cowswert has been rehabilitated here, any more than venireman Hooper was rehabilitated in *Gardner*, supra, by the simple expedient of promising to wait until all the punishment evidence is in to make his determination of "deliberateness." If in his mind "intentional" and "deliberate" are identical or synonymous, it does not matter *when* he makes the latter determination, so long as it follows his verdict finding that appellant intentionally killed. His resolution of the deliberateness issue will still be predetermined. Nor do I understand Cowswert at any time to have retreated from his position that "intentional" and "deliberate" mean the same. This situation does not call for deference to the trial court, for the record reveals a venireman who was neither "genuinely noncommittal, vacillating, equivocating [n]or uncertain," and thus we need not "make allowances for the fact that a judge, trying his qualifications for jury service, had an opportunity to observe his demeanor, intonation and expression." *Hernandez v. State*, 757 S.W.2d 744, at 753 (Tex.Cr.App.1988). Appellant's challenge for cause should have been granted.

While I agree with the majority's ultimate disposition of appellant's other points of error, I write further to disassociate myself from much that I consider erroneous and frequently unnecessary rationale.

Addressing appellant's first point of error, I agree the trial court committed compound error, first in instructing the venire at all with regard to the effect of failing to reach a verdict on any of the special issues, and secondly, in misinforming the venire of what that effect would be. The manner in which the majority proceeds to apply Tex. R.App.Pro., Rule 81(b)(2), however, is disturbing. The majority relies upon a "presumption" that jurors follow their instructions. But the instruction the majority sets out simply informs the jury that any issue it cannot answer either yes or no according to the court's instructions should be left unanswered. Nothing about this instruction remedies the fact that, contrary to the unambiguous language of Article 37.071(g), supra, the trial court has informed the venire, and then erroneously, of the *effect* of any failure to agree on one of the special issues. Nevertheless, by conjuring this shadow "presumption" the majority shifts the burden which Rule 81(b)(2), supra, places squarely on the State to show harmlessness, to appellant to show he was harmed. Thus the majority facilitates its conclusion that the trial court's error does not call for reversal.

I would take a different tack. It seems apparent to me that the purpose of Article 37.071(g), supra, is to act as a kind of inverted "dynamite" charge. The Legislature did not want jurors to know that failure to reach a punishment verdict—a hung jury—would *not* result in the State incurring the additional expense of a retrial. In other words, the Legislature, while desiring to avoid costly retrials in capital cases in which no punishment verdict is reached, did not wish jurors to take the fact that failure to answer one of the special issues nevertheless results in a life sentence, as

incentive to hang up whenever reaching a consensus seems too arduous.* Because an accused is indifferent whether he achieves his life sentence by way of a negative answer or a hung jury, the provision must be designed principally to benefit the State, by encouraging jurors to continue deliberating toward an affirmative answer where that is their collective inclination.

As the majority observes, appellant's jury appears to have had no trouble reaching a consensus to answer the special issues affirmatively. Thus, the purpose of the statute was not undermined by the trial court's error. Nor is it likely appellant would complain if it had been. For this reason I agree the error was harmless. Resort to the majority's purported "presumption" is wholly unnecessary.

Turning to appellant's third point of error, all that need be said is that the trial court instructed venireman Lamm in accordance with appellant's wishes, that upon affirmative answers to special issues "[t]he death penalty will be imposed." Nothing in the record suggests this instruction would not be efficacious. The majority's "deference" to the trial court in this instance, however, is purely rhetorical, for there is nothing here either which calls for assessment of attitude or demeanor. *Hernandez v. State*, supra. Indeed, in the colloquy excerpted by the majority, the venireman does not even speak!

In point of error four appellant attacks admission of extraneous offenses. The majority responds, in part, that "the evidence was necessary to refute that appellant was acting under sudden passion." At 284. This seems an anomalous rationale when one considers that in rejecting appellant's

---

* The positive misinformation the trial court gave the jury here, that a hung jury would mandate a mistrial, might conceivably have harmed appellant. A single juror or a minority of jurors holding out in the belief that at least one special issue must be answered "no" according to the evidence might nevertheless be persuaded to vote "yes" in order to avoid a mistrial that will never occur. Instructing the venire, contrary to the express provision of Article 37.071(g), supra, that even a solitary holdout can force imposition of a life sentence rather than a mistrial

would obviate this scenario. See generally, Clary, R.J., Voting for Death: Lingering Doubts About the Constitutionality of Texas' Capital Sentence Procedure, 19 St. Mary's L.J. 353 (1987). Yet appellant would not have this venire instructed that a life sentence will be imposed upon failure to reach a verdict on one of the special issues. He complains not of a purported unconstitutional application of Article 37.071(g), supra, see *Clary*, supra, but of its breach.

fifth point of error the majority holds, correctly in my view, that the issue of sudden passion arising from an adequate cause, V.T.C.A. Penal Code, § 19.04(a), was not raised by the evidence. I would simply hold evidence of these encounters was admissible to give context to the instant offense rather than as evidence from which the jury could draw inferences based upon character conformity. From that perspective the majority's inquiry into "similarity" of prior acts to the instant offense is irrelevant and unnecessary. Furthermore, I reject the majority's suggestion, in context of its superfluous prejudice-versus-probativeness analysis, that prejudicial impact of extraneous misconduct may somehow be "lessened" by packaging it as a "transaction" rather than an "offense." It is an accused's misconduct which prejudicially vilifies him, inviting improper character propensity inferences; not whether that misconduct has subjected him to "civil or criminal liability."

It is sufficient to dispose of appellant's fifth point of error to observe there was absolutely no evidence constituting "adequate cause." Absent evidence of some provocation on the part of the deceased or one acting with him, that appellant may have been incapable of cool reflection is not sufficient to raise the issue of whether he killed the deceased while under the influence of sudden passion arising from an adequate cause. *Hobson v. State,* 644 S.W.2d 473 (Tex.Cr.App.1983); *Gonzales v. State,* 717 S.W.2d 355 (Tex.Cr.App.1986) (Clinton. J., dissenting). Because "sudden passion" was not in fact raised by the evidence, I agree that failure of the paragraph authorizing conviction for capital murder to require negation of that issue beyond a reasonable doubt was not fundamental error under *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1985). See *Moore v. State,* 694 S.W.2d 528 (Tex.Cr.App.1985) (Clinton, J., dissenting). I disagree with the majority that "it is unnecessary to undertake a harm analysis under the second step of *Almanza,* supra, since ... appellant was not entitled to the charge." At 288–289. Rather, as I see it, finding no evidence of provocation is tantamount to finding no egregious harm under *Almanza.*

The majority then proceeds to "assume" the evidence did raise the issue of sudden passion, and with that premise decides that the paragraph authorizing conviction for capital murder need not contain the "implied element," see *Bradley v. State,* 688 S.W.2d 847 (Tex.Cr.App.1985), of the absence of sudden passion. This is so, reasons the majority, because "capital murder is essentially 'Murder Plus' another offense," At p. 289, the murder application paragraph in appellant's charge *did* require negation of sudden passion beyond a reasonable doubt, and that "consider[ing] the charge as a whole," At p. 289, the jury will devine that it must find absence of sudden passion in order to convict of capital murder as well. This argument echoes that of now-Presiding Judge McCormick in his dissenting opinion in *Cobarrubio v. State,* 675, S.W.2d 749 (Tex.Cr.App.1983), which was rejected by a majority of this Court. Here, no less than in *Cobarrubio,* supra, if the jury followed the trial court's instructions to the letter—a presumption the majority embraces willingly, if misguidedly, in resolving appellant's first point of error—there is every chance it found appellant guilty of capital murder without ever having to decide whether he acted under the immediate influence of sudden passion arising from an adequate cause. It is true that the implied element of absence of sudden passion was contained in the murder application paragraph. Even assuming the jury read the court's charge top to bottom, however, it need never have "considered" beyond the paragraph authorizing conviction for capital murder before obtaining its verdict. In failing to recognize this in its dicta today, the majority gratuitously threatens to undercut the rationale of *Cobarrubio* and set our jurisprudence back six years. The issue of sudden passion was not raised in this cause. No more than that need be said.

Finally, I also agree appellant's seventh point of error is without merit. The normative question of what punishment "would be most appropriate" in any given

case is not "a fact in issue" at the punishment phase of a capital murder trial under Article 37.071, supra. See, again, *Hernandez v. State*, supra. Thus it presents no relevant fact issue susceptible to proof by expert testimony as authorized by Tex.R. Cr.Evid., Rule 702. Nor would it seem that a jury's "reasoned moral response" to evidence proffered in mitigation, *Penry v. Lynaugh*, 492 U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), involves an issue of "fact" subject to expert assistance in contemplation of Rule 702, supra. Surely none but the individual jurors themselves can inform this exercise of the jury's collective conscience. If this is what the majority means in concluding the record did not show that Dickenson was "qualified to recommend punishment to the trier of fact[,]" At p. 291, then I agree without reservation.

Because the majority fails to sustain appellant's second point of error, I respectfully dissent.

DUNCAN, J., joins in this opinion.